UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CRIMINAL NO. **05 CR 1 0 C 1 0 NMG** |
| | )   Violations: |
| V. | )     18 U.S.C. §1341-Mail Fraud |
| | )     18 U.S.C. §1343-Wire Fraud |
| IGOR MOYSEYEV, | )     18 U.S.C. §1347-Health Care Fraud |
| SEVERIN YELAUN, | )     18 U.S.C. §1956-Money Laundering |
| DAVID S. TAMAREN and | )     18 U.S.C. §2-Aiding and Abetting |
| JOHN F. MONTONI | )     18 U.S.C. §371-Conspiracy |

**INDICTMENT**

The Grand Jury charges that:

**Introduction**

At all times relevant to this Indictment:

A.   The Insurance Companies; Automobile Insurance Policies; and Electrodiagnostics Testing

1.   The following insurance companies (hereinafter the "Carriers") among others issued or caused to be issued Massachusetts automobile insurance policies to consumers in the District of Massachusetts (hereinafter "this District"):

Holyoke Insurance (hereinafter "Holyoke)
Safety Insurance (hereinafter "Safety")
Commerce Insurance (hereinafter "Commerce")
CNA Insurance (hereinafter "CNA")
Liberty Mutual Insurance (hereinafter "Liberty")
Middlesex Insurance (hereinafter "Middlesex")
Plymouth Rock Insurance (hereinafter "Plymouth Rock")
People's Service Insurance (hereinafter "People's")
Fitchburg Mutual Insurance (hereinafter "Fitchburg")
Premier/Traveler's Insurance (hereinafter "Premier")
The Hartford Insurance (hereinafter "Hartford")
Commonwealth Mutual Insurance (hereinafter "Commonwealth")
Trust Insurance (hereinafter "Trust")
Republic Western Insurance (hereinafter "Republic")
Metropolitan/MetLife Insurance (hereinafter "MetLife")
Commercial Union Insurance (hereinafter "Commercial")
CGU Homeland Insurance (hereinafter "CGU" or "CU Homeland")

2.    All automobile insurance policies issued in this District by the Carriers contained health insurance benefit provisions for the payment of medical and hospital expenses incurred by their policy holders and occupants of their policy holders' vehicles for personal injuries sustained in motor vehicle accidents that required medical treatment.  These provisions are known as Personal Injury Protection and Med-Pay Benefits.  The issue of fault is of no relevance and all medical bills would be paid by the Carriers pursuant to the health insurance benefit provisions of the policies, as long as the injuries were related to the automobile accident and were medically necessary.

3.    The Carriers' policies are considered health care benefit programs as defined by 18 U.S.C. § 24, namely, "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual...."

4.    An individual who receives treatment as a result of an automobile accident can assign the payment of benefits directly to the health care provider who does the examination, treatment or diagnostic test.  The health care provider bills the insurance company for payment of the cost of the examination, treatment or test.

2

5.    Among the diagnostic tests available to a treating physician to evaluate the extent of an injury and source of pain being experienced by patients, are diagnostic studies and tests, such as Needle Electromyography (hereinafter "Needle EMG" or "EMG") and Nerve Conduction Velocity (hereinafter "NCV"). Both require specialized training to administer and interpret. Electromyography is an invasive test that measures muscle response to nervous stimulation (electrical activity within muscle fibers). For a Needle EMG, a needle electrode is inserted through the skin into the muscle. The electrical activity detected by this electrode is displayed on an oscilloscope (and may be displayed audibly through a speaker). Thus, the individual interpreting the EMG test must be present when it is administered. There may be some discomfort with insertion of the electrodes (similar to an intramuscular injection). Afterwards, the muscle may feel tender or bruised for a few days. The NCV is a similar test, but is not invasive and does not involve the insertion of needles. The electrodes are placed on the surface of the hands and feet, using small pads with adhesive. The results are recorded and can later be interpreted by someone properly trained in reading and interpreting NCVs. EMGs and NCVs are most often used when people have symptoms of weakness and numbness.

3

B.    The Defendants

6.    The Defendant, DAVID TAMAREN (hereinafter "DAVID TAMAREN" or "TAMAREN"), is a resident of Marblehead, Massachusetts.  DAVID TAMAREN is a medical doctor and is board certified in internal medicine and radiology.  DAVID TAMAREN saw patients at various physical therapy and rehabilitation clinics in the metro-Boston area, including in Lynn and Chelsea, Massachusetts, and referred his patients, as well as individuals who were not seen or treated by him, for diagnostic tests to various companies, including GLOBAL TECH DIAGNOSTICS (hereinafter "GLOBAL TECH"), and LYNN DIAGNOSTICS MANAGEMENT (hereinafter "LYNN DIAGNOSTICS") for EMG and NCV testing.  DAVID TAMAREN's role in the scheme set forth below was to write prescriptions for and sign other forms requesting EMG and/or NCV testing, without regard to medical necessity.  The vast majority of DAVID TAMAREN's patients claimed injuries from motor vehicle accidents.

7.    The Defendant JOHN MONTONI (hereinafter "JOHN MONTONI" or "MONTONI"), is a resident of Gloucester, Massachusetts. MONTONI is a licensed chiropractor.  MONTONI saw patients at various physical therapy and rehabilitation clinics in the metro-Boston area, including Lynn and Chelsea, Massachusetts, and referred his patients, as well as individuals who were not seen or treated by him, for diagnostic tests to various companies, including GLOBAL TECH and LYNN DIAGNOSTICS for EMG and NCV

4

testing. MONTONI's role in the scheme set forth below was to write prescriptions for and sign other forms requesting EMG and/or NCV testing, without regard to medical necessity. In addition, MONTONI signed reports that purported to be of EMG and NCV tests, while having no training or knowledge in performing such testing, having never done or reviewed any such tests, and, as a chiropractor and not a medical doctor, not being authorized to do EMG testing. The vast majority of MONTONI'S patients claimed injuries from motor vehicle accidents.

8.     The Defendant IGOR MOYSEYEV (hereinafter "IGOR MOYSEYEV" or "MOYSEYEV") owned and operated a number of clinics in the greater Boston area that treated individuals who had purportedly been injured in motor vehicle accidents. On or about January 29, 1999, MOYSEYEV incorporated GLOBAL TECH and opened a bank account, identifying himself as the authorized signatory. MOYSEYEV was involved in the management and operation of GLOBAL TECH. GLOBAL TECH, through MOYSEYEV and SEVERIN YELAUN (hereinafter "SEVERIN YELAUN" or "YELAUN"), offered diagnostic studies, including needle EMGs and NCVs, to patients involved in motor vehicle accidents.

9.     The Defendant SEVERIN YELAUN, although not identified as such on the papers of GLOBAL TECH, was a principal owner, and was involved in the management and operation of GLOBAL TECH. In addition, YELAUN, although not identified as such on the papers

5

of LYNN DIAGNOSTICS, was the owner and manager of LYNN
DIAGNOSTICS, and was involved in the day-to-day operation and
management of the company. On November 16, 1999, the Defendant
SEVERIN YELAUN and another person incorporated LYNN DIAGNOSTICS.
LYNN DIAGNOSTICS also offered diagnostic studies, including
needle EMGs and NVCs, to patients involved in motor vehicle
accidents.

C.   GLOBAL TECH DIAGNOSTICS and LYNN DIAGNOSTICS MANAGEMENT;
     and Health Insurance Claim Forms

     10.   GLOBAL TECH and LYNN DIAGNOSTICS provided EMG and NCV
testing. A doctor or chiropractor would prescribe EMG and/or NCV
testing. An employee of GLOBAL TECH or LYNN DIAGNOSTICS would
schedule the patient and a technician and doctor to administer
the prescribed test. In many cases, no EMG or NCV was scheduled,
false and fictitious documents were created and bills submitted
for tests never done. In other cases, other misrepresentations
would be the basis of false billings.

     11.   In order to administer and interpret both EMG and NCV
tests, one must receive specialized training. Because an EMG
test involves the insertion of needles, only a properly trained
medical doctor can administer an EMG test. Neither a technician
nor a chiropractor (even if trained) can administer an EMG.

     12.   If a Carrier's insured or an individual injured in a
motor vehicle of an insured underwent an EMG and/or NCV test as a
result of injuries sustained in an automobile accident, and in

6

cases where no such tests were administered, MOYSEYEV and YELAUN, either personally, or someone acting at their direction, through GLOBAL TECH, and YELAUN through LYNN DIAGNOSTICS would submit to the Carrier, through the United States mail, a health insurance claim form for payment.

D.    The Scheme to Defraud

13.    Between 1998 and 2002, Defendants YELAUN, MOYSEYEV, DAVID TAMAREN and MONTONI, through GLOBAL TECH, and YELAUN, DAVID TAMAREN and MONTONI through LYNN DIAGNOSTICS intentionally carried out a scheme to obtain, by means of false and fraudulent pretenses and representations, money under the custody of the Carriers' health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, specifically, Needle EMGs and NCVs.

14.    In order for YELAUN and MOYSEYEV, through GLOBAL TECH and LYNN DIAGNOSTICS, to be able to bill for fraudulent Needle EMGs and NCVs, they required a written request, prescription or formal medical order from either a medical doctor, such as the Defendant DAVID TAMAREN, or a chiropractor, such as the Defendant MONTONI.   The need for a formal order by either a medical doctor or chiropractor was required by the Carriers in order to confirm that the patient had been seen by a physician and further, that the test was medically indicated.

7

15.   It was part of the scheme and artifice to defraud that
MONTONI and TAMAREN prepared and signed prescriptions and other
documents requesting EMG and/or NCV tests without regard to
medical necessity.  MONTONI and TAMAREN also identified symptoms
and clinical data on the forms that were neither accurate nor
truthful.

16.   It was further part of the scheme and artifice to
defraud that MOYSEYEV and YELAUN, in connection with the
operation and management of GLOBAL TECH, prepared or caused
another to prepare documents requesting EMG and/or NCV testing,
and describing clinical data and symptoms, and affixed thereto
the stamped signature of a doctor (hereinafter referred to as
"Doctor A"), when said doctor had not prepared said form, had not
noted the clinical data and symptoms, had not approved the
contents of the form, and had not authorized the use of his
signature stamp.

17.   It was further part of the scheme and artifice to
defraud that MOYSEYEV and YELAUN, in connection with the
operation and management of GLOBAL TECH, generated, created and
prepared reports, or caused others to do so, of EMG and NCV tests
and affixed thereto the stamped signature of Doctor A,
representing that Doctor A had reviewed and approved the
conclusions of the report, when said doctor had not conducted the
test, had not reviewed the results, had not prepared or confirmed

8

the conclusions of the report, and had not authorized the use of his signature stamp.

18.   It was part of the scheme and artifice to defraud that Defendant YELAUN, in connection with the operation and management of LYNN DIAGNOSTICS prepared or caused to be prepared documents purporting to be a description of symptoms by patients, that were prepared and submitted by another, at YELAUN's direction, who signed the names of the various patients without knowledge or authorization of the patients.

19.   It was further part of the scheme and artifice to defraud, that YELAUN, as part of the operation and management of LYNN DIAGNOSTICS prepared and created reports, or caused another to do so, that purported to be of EMG and NCV tests on patients, when YELAUN knew that no such tests had been conducted.

20.   It was further part of the scheme and artifice to defraud that YELAUN, as part of the operation and management of LYNN DIAGNOSTICS created and prepared reports that purported to be of EMG and NCV tests conducted, or caused another to do so, and MONTONI signed said reports without having the training or knowledge to interpret EMG and NCV tests conducted by others, without being authorized to administer EMG tests himself, and without in any way having participated in any such tests or interpreting purported results.

21. It was part of the scheme and artifice that YELAUN and MOYSEYEV, through GLOBAL TECH and YELAUN through LYNN DIAGNOSTICS submitted and caused to be submitted Health Insurance Claim Forms based on false information and making false claims, to the Carriers' health care benefit programs for Needle EMGs and NCVs, in order to obtain reimbursements from the Carriers for this costly diagnostic procedure, knowing that the claim was false.

22. It was further part of the scheme and artifice to defraud that MOYSEYEV and YELAUN through GLOBAL TECH submitted and caused to be submitted documents substantiating the requests for payments on the Health Insurance Claim Forms, that contained false information and unauthorized stamped signatures, and included false and fictitious documents signed by Defendants DAVID TAMAREN and MONTONI.

23. It was part of the scheme and artifice that YELAUN and MOYSEYEV did receive payments from the Carriers' health care benefit programs for the Needle EMG and NCV examinations they claimed to have provided, when, as they well knew, that the information they submitted contained false information, unauthorized signatures, and other material misrepresentations.

24. It was part of the scheme and artifice that between 1998 and 2001, YELAUN and MOYSEYEV, as part of the operation and management of GLOBAL TECH, did submit and cause others to submit false claims to health care benefit programs totaling more than

10

$100,000, for services which they had not provided, or that were based on material misrepresentations.

25.  It was part of the scheme and artifice that between 1999 and 2001, YELAUN, as part of the operation and management of LYNN DIAGNOSTICS, did submit and cause others to submit false claims to health care benefit programs totaling more than $50,000, for services which they had not provided, or that were based on material misrepresentations.

E.   Fraudulent Billings

26.  As described above, the Defendants and others acting on their behalf, prepared and created documents, forms, and other records concerning and substantiating fraudulent billings. Among those fraudulent billings were those submitted in connection with the following individuals who were injured in automobile accidents:

27.  Miguel Berrios

a.   In early 1999, the exact date being unknown, the Defendant MONTONI prepared and signed an undated prescription for "EMG/NCV lower ext," that is, prescribing EMG and NCV testing of the lower extremities of Miguel Berrios.

b.   In early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed the stamped signature of Doctor A to certain forms, including a "Request for Electrodiagnostic Tests" dated

11

February 19, 1999 that contained a description of "Clinical Data (Diagnoses, Necessity for the Test)" and requested an EMG and NCV of the lower extremities for Miguel Berrios, and a second similar form, on the letterhead of GLOBAL TECH DIAGNOSTICS. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

     c.   In early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed the stamped signature of Doctor A to a three page report of the EMG and NCV tests, that were purportedly conducted on February 21, 1999, on Miguel Berrios. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner. Further, the EMG tests were not done on Miguel Berrios, as represented by the documents.

     d.   In early 1999, the exact date being unknown, an employee of GLOBAL TECH DIAGNOSTICS submitted a Health Insurance Claim Form to Safety Insurance Company, dated February 21, 1999, seeking payment of $1598.24 for EMG and NCV testing on Miguel Berrios. The Claim Form was received by Safety Insurance on or about April 21, 1999. The information on the Form represented that the referring physician was Doctor A, whose stamped signature was placed on several forms concerning Miguel Berrios.

     e.   On September 7, 1999, an employee of Defendants MOYSEYEV and YELAUN, identifying himself as "Billing Department,"

12

sent a letter to Safety Insurance Company on behalf of GLOBAL TECH DIAGNOSTICS.    The letter referenced Miguel Berrios and "[e]nclosed ... a bill and medical record for treatment rendered."   The letter further requested "payment at your earliest convenience."   GLOBAL TECH also supplied an affidavit that was signed by the employee, certifying that the "attached bills, records, and/or reports concerning services rendered to Berrios Miguel to be true and complete and that the charges therefore are fair and reasonable."

       f.    On or about March 15, 2000, Safety Insurance Company sent a letter to GLOBAL TECH informing them that Safety was unable to process the requests for payment of $1598.24, because Safety was "waiting for a completed PIP Applications form ..." and had "requested reports to determine if the medical treatment was reasonably, necessary and accident related."

       g.    On or about April 11, 2000, Symco Medical Billing, Inc., (hereinafter "Symco") acting as a collection agent for GLOBAL TECH, sent a letter to Safety Insurance.   The letter included "executed liens, signed affidavits and medical bills for .... Miguel Berrios [who] currently has an outstanding balance as follows: $1,598.24 - for GLOBAL TECH DIAGNOSTICS."

       h.    On or about April 26, 2000, a check for $1573.24 was issued by Safety Insurance to GLOBAL TECH DIAGNOSTICS for the EMG/NCV tests performed on Miguel Berrios, and mailed to GLOBAL

TECH.

i. On or about May 15, 2000, one or more of the Defendants or someone acting on their behalf received and deposited a check from Safety Insurance Company to GLOBAL TECH dated May 15, 2000, for Miguel Berrios, in the amount of $1573.24.

28. Inna Shtyrkov

a. In or about early 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed a prescription dated February 25, 1999, prescribing EMG testing of the upper extremities for Inna Shtyrkov.

b. In or about early 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of the upper extremities for Inna Shtyrkov.

c. In or about early 1999, the exact date being unknown, one or more of the defendants, or someone acting on their behalf, prepared and affixed thereto the stamped signature of Doctor A, to a report of NCV and EMG tests purportedly conducted on February 27, 1999, on Inna Shtyrkov. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner. Further, the EMG tests were not done on Inna Shtyrkov, as represented by the documents.

14

d.    In or about early 1999, the exact date being
unknown, one or more of the defendants, or someone acting on
their behalf, prepared and mailed to Liberty an undated Health
Insurance Claim Form, seeking payment in the amount of $1358.26
for NCV and EMG testing on Inna Shtyrkov, conducted on March 13,
1999.  According to the Claim Form the referring physician was
the Defendant DAVID TAMAREN and the physician providing the
testing was identified as the Defendant JOHN MONTONI.

e.    Defendant DAVID TAMAREN also wrote prescriptions
for various durable medical goods, including a TENS Unit, an
orthopedic car seat, a cervical collar and a cervical pillow, for
which (on February 25, 1999), Monroe Medical Services, Inc.
billed Liberty; some of these items were never received by Inna
Shtyrkov.

f.    On or about February 7, 2000, an attorney
representing Inna Shtyrkova, sent a letter to GLOBAL TECH,
enclosing a check for "$454.89 which represents full and final
payment for services."

g.    On or about February 10, 2000, one or more of the
Defendants or someone acting on their behalf received and
deposited a check from Liberty in the amount of $454.89 for
services to Inna Shtyrkova.

h.    On or about October 1, 2001, Symco sent, by
facsimile transmission, to an attorney representing Inna

15

Shtyrkov, a cover sheet and referenced documents, including a
"certified bill with attached medical records for the above named
patient for visit to GLOBAL TECH DIAGNOSTICS."  The patient named
is Inna Shtyrkov.  The attached documents include a certification
from an employee of Symco, certifying that the attached billing
statement in the amount of $1356.26 is true and complete.  The
billing that was attached was the Health Insurance Claim Form
described above, seeking $1358.26 for EMG and NCV testing on
Shtyrkov on March 13, 1999.

    29.  <u>Martha Casco</u>

      a.  On or about October 8, 1998, the Defendant DAVID
TAMAREN prepared and signed a prescription, prescribing NCV and
EMG testing of the lower extremities of Martha Casco.

      b.  On or about November 12, 1998, the Defendant
TAMAREN signed a prescription of NCV and EMG testing of the lower
extremities for Martha Casco.

      c.  On or about November 14, 1998, the Defendant DAVID
TAMAREN prepared and signed a request for an EMG and NCV of the
upper and lower extremities for Martha Casco.

      d.  In late 1998, the exact date being unknown, one or
more of the Defendants, or someone acting on their behalf,
prepared a document, and affixed thereto the stamped signature of
Doctor A, said document purporting to be a report of EMG and NCV
testing purportedly done on Martha Casco on November 14, 1998.

16

Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner. Further, the EMG tests were not done on Martha Casco as represented by the documents.

      e.    In late 1998, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Commercial Union a Health Insurance Claim Form, seeking payment in the amount of $2718.56 for NCV and EMG testing purportedly conducted on November 14, 1998, on Martha Casco. According to the Claim Form, dated December 12, 1998, the referring physician was the Defendant DAVID TAMAREN and the physician providing the testing was identified as the Defendant JOHN MONTONI.

      f.    On or about March 5, 1999, Commerce sent a letter to GLOBAL TECH, informing them that the claim for payment for services to Casco is "still under investigation."

      g.    On or about April 16, 1999, Commerce sent a letter to an attorney representing Martha Casco stating that an independent medical examiner found the neurological testing on Ms. Casco unnecessary and, therefore, the bills submitted by GLOBAL TECH would not be paid.

      h.    On or about October 11, 2001, an employee of GLOBAL TECH sent a letter to Commerce Insurance Company. The letter referenced Martha Casco and "[e]nclosed... all medical

bills and notes from November 14, 1998 for GLOBAL TECH
DIAGNOSTICS".

     30.   <u>Serena Dos</u>

       a.   Sometime in 1999 or early 2000, the exact date
being unknown, the Defendant MONTONI prepared and signed an
undated prescription requesting both an EMG and NCV of the lower
extremities on Serena Dos.

       b.   Sometime in 1999, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV of the lower extremities for Serena
Dos.

       c.   Sometime in early 1999, the exact date being
unknown, one of the Defendant, or someone acting on their behalf,
prepared a document, and affixed thereto the stamped signature of
Doctor A, said document purporting to be a report, dated February
27, 1999, of EMG and NCV tests purportedly conducted on Serena
Dos.  Doctor A did not do the tests, did not prepare or review
the report and did not authorize anyone to use his signature
stamp in this manner.  Serena Dos was not given the tests as
described.

       d.   In early 1999, the exact date being unknown, one
of the Defendants, or someone acting on their behalf, prepared
and mailed a Health Insurance Claim Form to Fitchburg, seeking
payment in the amount of $1598.24 for NCV and EMG testing

18

purportedly conducted on Serena Dos on March 13, 1999.  According
to the undated Claim Form the referring physician was the
Defendant DAVID TAMAREN and the physician providing the testing
was identified as the Defendant JOHN MONTONI.

     e.   In early 2000, the exact date being unknown, one
of the Defendants, or someone acting on their behalf, prepared
and mailed a second Health Insurance Claim Form on behalf of
GLOBAL TECH to the Fitchburg Mutual, again seeking payment in the
amount of $1598.24 for NCV and EMG testing conducted on February
27, 1999.  The second form was dated May 24, 2000.  According to
the second Claim Form the referring physician was Defendant
MONTONI.

     f.   On or about May 21, 1999, Fitchburg mailed a
letter to GLOBAL TECH concerning the claim for payment for the
testing of Serena Dos.  The letter acknowledges receipt of the
bills and states that they have been forwarded for audit.

     g.   On or about November 1, 1999, Fitchburg mailed a
letter to GLOBAL TECH.  The letter states that payments cannot be
made "at this time" because there is a question as to whether
benefits are available under the terms of the policy.

     h.   On or about May 24, 2000, Symco on behalf of
GLOBAL TECH, over the signature of an employee identified as
"Medical Biller," mailed a letter to Fitchburg Mutual Insurance.
The letter referenced Serena Dos and "[e]nclosed... itemized

bills and corresponding medical records, for services rendered to this patient...please issue payment to the above provider." The amount of the bill was $1598.24.

i.    On or about May 24, 2000, Symco, on behalf of GLOBAL TECH, mailed a letter to an attorney representing Ms. Dos, concerning the balance owed to GLOBAL TECH for services.

j.    On or about June 6, 2000, a lawyer for Fitchburg mailed a letter to GLOBAL TECH. The letter references the receipt of two bills for testing of Serena Dos, and the investigation conducted, that included a statement from Dos. An independent medical review of the file determined that the tests were not medically necessary. In addition, Ms. Dos testified that she never had the EMG or NCV testing. Therefore, the claim was denied.

k.    On or about June 13, 2000, Symco, on behalf of GLOBAL TECH, mailed a letter to an attorney representing Serena Dos, and attached a copy of the letter it received dated June 6, 2000. A "Collector" for Symco, asked to include the balance owed to GLOBAL TECH in any settlement of the Dos case.

31.  Christopher Zombrano

a.    In early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed thereto the stamped signature of Dr. A, to an undated request for electro-diagnostic tests for an EMG and

20

NCV of the lower extremities of Christopher Zombrano. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

      b.   In early 1999, the exact date being unknown, Defendant MONTONI prepared and signed an undated prescription for an EMG and NCV of the lower extremities for Christopher Zombrano.

      c.   In early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed thereto the stamped signature of Dr. A, to report for the EMG and NCV testing dated February 20, 1999, on Zombrano. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner. Further, the testing was never done on Zombrano as represented in the report.

      d.   In early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty a Health Insurance Claim Form, seeking payment to GLOBAL TECH in the amount of $1598.24 for NCV and EMG testing conducted on February 20, 1999, on Christopher Zombrano. According to the Claim Form, dated January 1, 1999 (sic), the referring physician was Doctor A.

      e.   On or about May 26, 1999, GLOBAL TECH, through the "Billing Department," sent a letter to Liberty Mutual. The letter referenced Christopher Zombrano and "[e]nclosed... a bill

21

and medical record for services rendered." GLOBAL TECH also supplied an affidavit that was signed by a "Billing Agent," certifying that the "attached bills, records, and/or reports concerning services rendered to Zombrano be true and complete and that the charges therefore are fair and reasonable."

   f. On or about January 28, 2000, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

   g. On or about February 19, 2001, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

   h. On or about March 20, 2001, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

  32. Wynter Plunkett

   a. On or about November 6, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription, prescribing an EMG test for Wynter Plunkett.

b.     Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of the lower extremities for Wynter Plunkett.

c.     On November 6, 1999, the Defendant MONTONI affixed his signature to a document, said document purportedly being a report of the EMG and NCV testing purported performed on Wynter Plunkett.   The EMG tests were not done on Wynter Plunkett as represented by the documents.

d.     On or about December 13, 1999, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty Mutual Insurance, a Health Insurance Claim Form, seeking payment in the amount of $1318.00 for NCV and EMG testing purportedly conducted on November 6, 1999, on Wynter Plunkett. According to the Claim Form, dated December 13, 1999, the referring physician was the Defendant DAVID TAMAREN and the physician providing the testing was identified as the Defendant JOHN MONTONI.

e.     On or about December 14, 1999, LYNN DIAGNOSTICS, through Symco Medical Billing, Inc. over the signature of an individual identified as a "Medical Biller", submitted a bill to Liberty Mutual Insurance in the amount of $1318.00 for services to Wynter Plunkett, provided on November 6, 1999.

23

f.    On or about March 6, 2000, LYNN DIAGNOSTICS, through Symco Medical Billing, faxed the bill identified in the preceding paragraph with the following language attached: "enclosed are the bill and notes for Wynter Plunkett who treated at Lynn Diagnostic Management, Inc."

g.    On April 15, 2001, the bill in the amount of $1318.00 for services to Wynter Plunkett was once again faxed to Liberty Mutual Insurance by a principal of LYNN DIAGNOSTICS from an Ashland, Massachusetts address.

33.   Jose Grullon

a.    On December 13, 1999, the defendant DAVID TAMAREN prepared and signed a prescription for an EMG and NCV of the upper the lower extremities on the right side for Jose Grullon.

b.    Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for a Physician's Order For Diagnostic Exam/Test for Jose Grullon.  All boxes that would identify what tests were to be conducted and which extremities tested were left blank.  This request was made on letterhead of LYNN DIAGNOSTICS

c.    Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG of the right upper extremity and left and right lower extremity and an NCV of the left lower extremity and upper extremities, for Jose Grullon.

24

d.     On or about December 18, 1999, the Defendant
MONTONI affixed his signature to a document, said document
purportedly being an EMG and NCV report purported to have been
performed on Jose Grullon.  The EMG tests were not done on Jose
Grullon as represented by the documents.

e.     On or about February 11, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to CU Homeland Insurance a Health Insurance Claim Form, seeking
payment in the amount of $2494.00 for NCV and EMG testing
purportedly conducted on December 18, 1999 on Jose Grullon.
According to the Claim Form, dated December 18, 1999, the
referring physician was the Defendant TAMAREN, and the doctor
providing the testing was the Defendant MONTONI.

f.     On or about February 17, 2000, CGU mailed a letter
to LYNN stating that bills are being reviewed and upon receipt
and review of the medical records of treatment to Grullon, CGU
would advise of the outcome of the review.

g.     On or about March 6, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to CU Homeland Insurance a Health Insurance Claim Form, seeking
payment to LYNN DIAGNOSTICS in the amount of $2494.00 for NCV and
EMG testing purportedly conducted on December 18, 1999 on Jose
Grullon.  According to the Claim Form, dated March 6, 2000, the
referring physician was the Defendant DAVID TAMAREN and the

physician who provided the testing was the Defendant JOHN
MONTONI.

        h.    On or about March 10, 2000, CGU mailed a letter to
LYNN c/o Symco advising them that the PIP coverage was exhausted
and future bills should be submitted to Grullon's private health
carrier.

        i.    On or about March 15, 2000, CGU mailed a letter to
Lynn c/o Symco advising them that the PIP coverage was exhausted
and future bills should be submitted to Grullon's private health
carrier.

        j.    On or about March 17, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Blue Cross Blue Shield of Massachusetts a Health Insurance
Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of
$2494.00 for NCV and EMG testing purportedly conducted on
December 18, 1999 on Jose Grullon.  According to the Claim Form,
dated March 17, 2000, the referring physician was the Defendant
DAVID TAMAREN and the physician who provided the testing was the
Defendant JOHN MONTONI.

    34.  <u>Claudia Batia</u>

        a.    On or about December 16, 1999, the Defendant DAVID
TAMAREN prepared and signed a prescription for an EMG and NCV for
Claudia Batia.

b.    Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of both upper extremities for Claudia Batia.

c.    On or about December 18, 1999, the Defendant MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on behalf of Claudia Batia.  The EMG tests were not done on Claudia Batia as represented by the documents.

d.    On or about January 3, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Trust Insurance, a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of $1352.00 for NCV and EMG testing purportedly conducted on December 18, 1999 on Claudia Batia.  According to the Claim Form, dated January 3, 2000, the referring physician was the Defendant DAVID TAMAREN and the physician who provided the testing was the Defendant JOHN MONTONI.

e.    As part of the submissions in the Batia file, an individual signed and mailed to Trust Insurance an affidavit, dated March 15, 2000, certifying the accuracy of the bills submitted by LYNN DIAGNOSTICS for services rendered.

27

35.  Paul Musaelyants

a.  In or about December 1999, the Defendant DAVID TAMAREN prepared and signed an undated prescription prescribing EMG testing of Paul Musaelyants.

b.  In or about December 1999, the Defendant MONTONI signed a report of testing purportedly done on Paul Musaelyants on or about December 16, 1999.

c.  On or about December 17, 1999, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Commerce Insurance, a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of $2548.00 for NCV and EMG testing purportedly conducted on December 16, 1999 on Paul Musaelyants. According to the Claim Form, dated December 17,1999, the referring physician was the Defendant DAVID TAMAREN and the physician who provided the testing was the Defendant JOHN MONTONI.

d.  On or about December 17, 1999, a Medical Biller for Symco sent a letter to Commerce seeking payment of $2548 for testing purportedly done on Paul Musaelyants on December 16, 1999.  The letter referenced the enclosed bills and recrods.

e.  On or about January 20, 2000, a "Medical Biller" employed by Symco, drafted and mailed to Commerce a letter requesting payment of $460 to LYNN DIAGNOSTICS, for services to Paul Musaelyants on January 13, 2000.  The letter identified an

28

outstanding balance of $3008.

36.  Raisa Tkach

a.    In or about December 1999, the Defendant DAVID
TAMAREN signed an undated prescription prescribing EMG testing of
Raisa Tkach.

b.    In or about 1999, the Defendant MONTONI signed an
undated report of testing purportedly done on Raisa Tkach on
December 9, 1999.

c.    On or about December 17, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce Insurance a Health Insurance Claim Form, seeking
payment to LYNN DIAGNOSTICS in the amount of $2548.00 for NCV and
EMG testing purportedly conducted on December 9, 1999 on Raisa
Tkach.  According to the Claim Form, dated December 17, 1999, the
referring physician was the Defendant DAVID TAMAREN and the
physician who provided the testing was the Defendant JOHN
MONTONI.

d.    In or about December 1999, an individual an
individual acting at the direction of the Defendant YELAUN
completed a "Cervical/Lumbar Spine Questionnaire," with
information that was provided to her by YELAUN, and signed
another's name to the document.  On or about December 17, 1999,
the Questionnaire was included in documents mailed to Commerce.

29

e.     On or about December 17, 1999, a "Medical Biller" employed by Symco drafted and mailed to Commerce a letter seeking payment of $2548 to LYNN DIAGNOSTICS, for services to Raisa Tkach on December 9, 1999.  The letter referenced the enclosed bills and records.

f.     On or about January 20, 2000, a "Medical Biller" employed by Symco, drafted and mailed to Commerce a letter requesting payment of $237.00, to LYNN DIAGNOSTICS, for services to Raisa Tkach on January 13, 2000.  The letter identified an outstanding balance of $2785.

g.     On or about November 7, 2000, an attorney representing Viktoria Tkach, Raisa Tkach and Paul Musaelyants, drafted and mailed to Commerce a letter requesting of the Commerce claims adjuster "documentation to support the allegation that the treatment with LYNN DIAGNOSTICS for the above three claimants was not 'considered reasonable.'"

37.  Wanda Gonzales

a.     On or about December 16, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription for an EMG for Wanda Gonzalez.

b.     On or about December 22, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription for an EMG and NCV for Wanda Gonzalez.

30

c.   Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV for Wanda Gonzales.

d.   On or about December 22, 1999, the Defendant MONTONI affixed his signature to a document, said document purportedly being an EMG and NCV report purported to have been performed on behalf of Wanda Gonzalez.  The EMG tests were not done on Wanda Gonzalez.

e.   On or about April 18, 2000, Arbella Insurance issued and mailed a check in the amount of $1352.00 as payment for NCV and EMG testing purportedly conducted on December 22, 1999 on Wanda Gonzalez.  The check was endorsed by one of the principals of LYNN DIAGNOSTICS, and on behalf of the Defendants.

38.   Quelvis Mendez

a.   Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated prescription for an EMG and NCV for Quelvis Mendez.

b.   Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of both lower extremities on Quelvis Mendez.

c.   On or about January 20, 2000, the Defendant MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to

31

have been performed on behalf of Quelvis Mendez.  The EMG tests
were not done on Quelvis Mendez as represented by the documents.

      d.  On or about January 27, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Fireman's Fund Insurance, a Health Insurance Claim Form,
seeking payment to LYNN DIAGNOSTICS in the amount of $1318.00 for
NCV and EMG testing purportedly conducted on January 20, 2000 on
Quelvis Mendez.  According to the Form, the physician who
provided the testing was the Defendant JOHN MONTONI

    39.  Stephanie Martinez

      a.  Sometime in 1999, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
prescription for an EMG for Stephanie Martinez.

      b.  On or about November 19, 1999, the defendant DAVID
TAMAREN prepared and signed a request for an EMG and NCV of the
lower extremities for Stephanie Martinez.

      c.  Sometime in 1999, the exact date being unknown,
the Defendant MONTONI affixed his signature to a document, said
document purportedly being a report of EMG and NCV testing
purported to have been performed on Stefanie Martinez.  The EMG
tests were not done on Stefanie Martinez as represented by the
documents.

      d.  On or about December 13, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed

to Commerce Insurance a Health Insurance Claim Form, seeking
payment to LYNN DIAGNOSTICS in the amount of $1318.00 for NCV and
EMG testing purportedly conducted on November 19, 1999, on
Stefanie Martinez.  According to the Claim Form, dated December
13,1999, the referring physician was the Defendant DAVID TAMAREN
and the physician who provided the testing was the Defendant JOHN
MONTONI.

     e.    On or about May 15, 2000, Commerce Insurance
issued and mailed a check in the amount of $1318.00 as payment
for NCV and EMG testing purportedly conducted on November 19,
1999 on Stefanie Martinez.  The check was endorsed by one of the
principals of LYNN DIAGNOSTICS, and on behalf of the Defendants.

    40.  Secundino Reyes

     a.    On or about January 14, 2000, the Defendant DAVID
TAMAREN prepared and signed a prescription for an EMG and NCV for
Secundino Reyes.

     b.    Sometime in 2000, the exact date being unknown,
the defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV of both the left upper and lower
extremities for Secundino Reyes.

     c.    On or about January 15, 2000, the Defendant
MONTONI affixed his signature to a document, said document
purportedly being a report of EMG and NCV testing purported to
have been performed on Secundino Reyes.  The EMG tests were not

33

done on Secundino Reyes as represented by the documents.

d.   On or about January 19, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty Mutual Insurance a Health Insurance Claim Form, seeking payment to Lynn Diagnostics in the amount of $2548.00 for NCV and EMG testing purportedly conducted on January 15, 2000 on Secundino Reyes.  According to the Claim Form, dated January 19, 2000,the referring physician was the Defendant DAVID TAMAREN, and the physician providing the testing was the Defendant MONTONI.

41.   Gale Famolari, a/k/a Johnson

a.   On or about January 13, 2000, the Defendant DAVID TAMAREN signed a prescription prescribing EMG and NCV testing for Gail Famolari.  Defendant TAMAREN also signed an undated request for EMG and NCV testing of the upper and lower extremities for Famolari.

b.   On or about January 8, 2000, the Defendant JOHN MONTONI signed a report that purported to be the results of the EMG and NCV tests on Gail Famolari.

c.   On or about January 27, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Commerce a Health Insurance Claim Form, dated January 27, 2000, seeking payment of $2494 to LYNN DIAGNOSTICS for EMG and NCV testing of Famolari on January 8, 2000.  The physician who provided the testing was identified as the Defendant JOHN

34

MONTONI.

d.    On or about January 27, 2000, an employee of Symco drafted and mailed a letter to Commerce, seeking payment of $2494 to LYNN DIAGNOSTICS for services to Gale Famolari on January 8, 2000.

e.    On or about March 16, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Commerce a Health Insurance Claim Form, dated March 16, 2000, seeking payment of $2494 to LYNN DIAGNOSTICS for EMG and NCV testing of Famolari on January 8, 2000.  The physician who provided the testing was identified as the Defendant JOHN MONTONI.

42.    Ada Mateo

a.    On or about January 6, 2000, the Defendant TAMAREN signed a prescription, prescribing EMG and NCV testing of Ada Mateo.  Defendant DAVID TAMAREN also signed an undated request for EMG and NCV tests of the upper left extremities of Ada Mateo.

b.    On or about February 2, 2000, the Defendant JOHN MONTONI signed a document purporting to be a report of tests conducted on Ada Mateo.

c.    On or about February 10, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Trust Insurance a Health Insurance Claim Form, dated February 10, 2000, seeking payment of $1352 to LYNN DIAGNOSTICS for EMG

35

and NCV testing on Ada Mateo, performed on February 2, 2000.  The
Form identified the referring physician as the Defendant DAVID
TAMAREN and the physician who performed the tests as the
Defendant JOHN MONTONI.

       d.    On or about February 10, 2000, a "Medical Biller"
for Symco, drafted and mailed to Trust a letter and attachments,
seeking payment of $1352 for services rendered to Ada Mateo by
LYNN DIAGNOSTICS.

       e.    As part of the submissions in the Mateo file, on
or about March 15, 2000, an individual signed and  mailed to
Trust Insurance that included an affidavit, dated March 15, 2000,
certifying the accuracy of the bills submitted by LYNN
DIAGNOSTICS for services rendered.

43.  Yicauri Rodriques

       a.    In or about November 1999, the Defendant DAVID
TAMAREN signed an undated request for EMG and NCV testing of both
lower extremities of Yicauri Rodriguez.  Defendant DAVID TAMAREN
also signed an undated prescription prescribing EMG testing of
Rodriguez.

       b.    On or about November 6, 1999, the Defendant JOHN
MONTONI signed a document purporting to be a report of EMG and
NCV testing done on Rodriguez on November 6, 1999.

       c.    On or about December 13, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed

36

to Liberty a Health Insurance Claim Form seeking payment of $1318
to LYNN DIAGNOSTICS, for EMG and NCV testing on Yicauri
Rodriguez, purportedly conducted on November 6, 1999. The form
identified the referring physician as the Defendant DAVID TAMAREN
and the physician conducting the tests as Defendant JOHN MONTONI.

      d.   On December 14, 1999, a "Medical Biller" for
Symco, drafted and mailed to Liberty Mutual, bills and medical
records, seeking payment of $1318 to LYNN DIAGNOSTICS, for
services to Yicauri Rodriguez.

      e.   On or about February 8, 2000, a "Medical
Collections Specialist" for Symco, drafted and mailed to Liberty
Mutual, a letter seeking payment of $1318 for services rendered
by LYNN DIAGNOSTICS to Rodriguez.

      f.   On or about February 11, 2000, a "Medical Biller"
for Symco, drafted and mailed to Liberty a letter and enclosed
copies of bills and other records, seeking payment of $1318 for
the services to Yicauri Rodriguez, on November 6, 1999.

      g.   On or about February 11, 2000, a "Medical Biller"
for Symco, drafted and mailed to an attorney representing
Rodriguez a letter and enclosed copies of bills and other
records, seeking payment of $1318 for the services to Yicauri
Rodriguez, on November 6, 1999.

      h.   On or about February 11, 2000, LYNN prepared and
mailed to Liberty a Health Insurance Claim Form seeking payment

of $1318 for testing purportedly done on Rodriguez on November 6,
1999.  The form identified the referring physician as TAMAREN and
the physician providing the testing as MONTONI.

44.  Julie (Leyfer) Gelfin

a.    In or about January 2000, the Defendant JOHN
MONTONI signed an undated prescription, prescribing EMG and NCV
testing for Leyfer.

b.    In January 2000, the Defendant JOHN MONTONI signed
a document, purporting to be a report of EMG and NCV testing done
on January 8, 2000 on Julie Leyfer.

c.    On or about January 27, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce a Health Insurance Claim Form, dated January 27,
2000, for EMG and NCV testing of January 8, 2000 on Julie Leyfer.
The form identified the doctor providing the testing as the
Defendant JOHN MONTONI, and sought payment of $1352 for LYNN
DIAGNOSTICS.

d.    In January 2000, a "Medical Biller" for Symco,
drafted and mailed to Commerce a letter and documentation in an
effort to collect for EMG/NCV testing services purportedly
provided by LYNN DIAGNOSTICS MANAGEMENT to Julie Leyfer.  The
letter requested payment of $1352 to LYNN DIAGNOSTICS for
services to Julie Lyfer on January 8, 2000.  The letter
referenced enclosed bills and medical records.

38

e.    On or about March 30, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce a Health Insurance Claim Form, dated March 30, 2000,
for EMG and NCV testing of January 8, 2000 on Julie Leyfer.  The
form identified the doctor providing the testing as the Defendant
JOHN MONTONI, and sought payment of $1352 for LYNN DIAGNOSTICS.

45.  Carmen Marmolejos

a.    Sometime in 2000, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
prescription for an EMG and NCV testing for Carmen Marmolejos.

b. Sometime in 2000, the exact date being unknown, the
Defendant DAVID TAMAREN prepared and signed an undated request
for EMG and NCV testing of the left upper extremities of Carmen
Marmolejos.

c.    On or about January 8, 2000, the Defendant MONTONI
affixed his signature to a document, said document purportedly
being a report of EMG and NCV testing purported to have been
performed on Carmen Marmolejos.  The EMG tests were not done on
Carmen Marmolejos as represented by the documents.

d.    On or about February 16, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to an attorney a Health Insurance Claim Form, seeking payment to
LYNN DIAGNOSTICS in the amount of $1352.00 for NCV and EMG
testing purportedly conducted on January 8, 2000 on Carmen

39

Marmolejos.  According to the Claim Form, dated February 16, 1999, the referring physician was the Defendant DAVID TAMAREN, and the physician who provided the testing was the Defendant JOHN MONTONI.

e.    On or about March 13, 2000, CGU mailed a letter to LYNN c/o Symco, stating that the bills submitted would not be paid at this time.  After receipt and review of the medical records for treatment of Marmolejos, LYNN would be advised of the results of the review.

f.    On or about March 16, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to CGU Insurance a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of $1352.00 for NCV and EMG testing purportedly conducted on January 8, 2000 on Carmen Marmolejos.  According to the Claim Form, dated March 16, 1999, the referring physician was the Defendant DAVID TAMAREN, and the physician who provided the testing was the Defendant JOHN MONTONI.

f.    On or about May 17, 2001, CGU Insurance issued and mailed a check in the amount of $1273.47 as payment to LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on January 8, 2000 on Carmen Marmelojos.  The check was endorsed by one of the principals of LYNN DIAGNOSTICS, and on behalf of the Defendants and was deposited on May 21,2001 in the account of LYNN DIAGNOSTICS.

## COUNTS ONE THROUGH THIRTY-SEVEN
## TITLE 18, UNITED STATES CODE, SECTION 1341
## (MAIL FRAUD)

1.    Paragraphs 1 through 45 set forth above, are hereby realleged and incorporated as if fully set forth herein.

2.    From in or before January 29, 1999, through in or about 2002, the defendants, IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI, devised a scheme and artifice to defraud insurance companies doing business in the District of Massachusetts, and for obtaining money, by means of false and fraudulent pretenses, representations and promises.

3.    The scheme and artifice to defraud and for obtaining money through false and fraudulent pretenses, representations and promises, included the defendants IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI preparing and signing prescriptions and other documents requesting and prescribing unnecessary diagnostics tests, and containing false statements about symptoms, complaints and clinical data, preparing false reports of diagnostic tests, signing reports of tests not done and not reviewed, and affixing a stamped signature to documents and reports without authorization or authority, submitting and causing others to submit letters and certifications to insurance companies certifying the accuracy and completeness of false documents, and requesting payment based on these and other false representations, when defendants IGOR MOYSEYEV, SEVERIN YELAUN,

41

DAVID S. TAMAREN and JOHN F. MONTONI knew that said documents,
letters, forms and certifications, included false and fraudulent
statements and information, and other misrepresentations
concerning the treatment, examinations, tests and clinical data
pertaining to alleged injured individuals.  The defendants IGOR
MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI
intended thereby to induce the insurance companies to make
payments to GLOBAL TECH DIAGNOSTICS and LYNN DIAGNOSTICS
MANAGEMENT for the tests that were represented to have been done
and analyzed, and the reports that were represented to have been
properly reviewed and written.

     4.    It was part of the scheme and artifice to defraud and
for obtaining money through false and fraudulent pretenses,
representations and promises, that the defendants, IGOR MOYSEYEV,
SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI, submitted,
or caused others to submit, documents, letters, forms and
information as set forth in paragraphs 27 through 45, above.

     5.    On or about the dates listed below, at Boston, in the
District of Massachusetts and elsewhere, the defendants,

                     IGOR MOYSEYEV,
                     SEVERIN YELAUN,
                   DAVID S. TAMAREN and
                    JOHN F. MONTONI,

having devised and intending to devise the above-described scheme
and artifice to defraud and for obtaining money and property by
means of materially false pretenses, representations, and

                              42

promises, for the purpose of executing such scheme and artifice and attempting to do so, did knowingly place and cause to be placed in a post office and authorized depository for mail, a matter and thing to be sent and delivered by the United States Postal Service, and knowingly caused to be delivered by mail according to the direction thereon and at the place at which it was directed to be delivered by the person to whom it was addressed:

| COUNT | DATE | TYPE OF MAILING | PARAGRAPH |
|-------|------|-----------------|-----------|
| One | April 11, 2000 | letter & enclosures | 27(g) |
| Two | April 26, 2000 | check | 27(h) |
| Three | February 7, 2000 | letter & check | 28(f) |
| Four | October 11, 2001 | letter & enclosures | 29(h) |
| Five | May 24, 2000 | letter & enclosures | 30(e)&(h) |
| Six | May 24, 2000 | letter | 30(i) |
| Seven | June 13, 2000 | letter | 30(k) |
| Eight | January 28, 2000 | letter | 31(f) |
| Nine | February 19, 2001 | letter | 31(g) |
| Ten | March 20, 2001 | letter | 31(h) |
| Eleven | February 11, 2000 | claim form | 33(e) |
| Twelve | February 17, 2000 | letter | 33(f) |
| Thirteen | March 6, 2000 | claim form | 33(g) |
| Fourteen | March 10, 2000 | letter | 33(h) |
| Fifteen | March 15, 2000 | letter | 33(i) |

43

| | | | |
|---|---|---|---|
| Sixteen | March 17, 2000 | claim form | 33(j) |
| Seventeen | March 15, 2000 | affidavit | 34(e) |
| Eighteen | January 20, 2000 | letter | 35(e) |
| Nineteen | January 20, 2000 | letter | 36(f) |
| Twenty | November 7, 2000 | letter | 36(g) |
| Twenty-One | April 18, 2000 | check | 37(e) |
| Twenty-Two | January 27, 2000 | claim form | 38(d) |
| Twenty-Three | May 15, 2000 | check | 39(e) |
| Twenty-Four | January 19, 2000 | claim form | 40(d) |
| Twenty-Five | January 27, 2000 | letter & claim form | 41(c)&(d) |
| Twenty-Six | March 16, 2000 | claim form | 41(e) |
| Twenty-Seven | February 10, 2000 | letter & claim form | 42(c)&(d) |
| Twenty-Eight | March 15, 2000 | affidavit | 42(e) |
| Twenty-Nine | February 8, 2000 | letter | 43(e) |
| Thirty | February 11, 2000 | letter & enclosures | 43(f)&(h) |
| Thirty-One | February 11, 2000 | letter & enclosures | 43(g)&(h) |
| Thirty-Two | January 27, 2000 | letter & claim form | 44(c)&(d) |
| Thirty-Three | March 30, 2000 | claim form | 44(e) |
| Thirty-Four | February 16, 2000 | claim form | 45(d) |
| Thirty-Five | March 13, 2000 | letter | 45(e) |
| Thirty-Six | March 16, 2000 | claim form | 45(f) |
| Thirty-Seven | May 17, 2001 | check | 45(g) |

All in violation of Title 18, United States Code, Sections 1341 and 2.

44

**COUNT THIRTY-EIGHT THROUGH COUNT FORTY
TITLE 18, UNITED STATES CODE, SECTION 1343
(WIRE FRAUD)**

1.    Paragraphs 1 through 45, set forth above, are hereby realleged and incorporated as if fully set forth herein.

2.    From in or before January 29, 1999, through in or about 2002, the defendants, IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI, devised a scheme and artifice to defraud insurance companies doing business in the District of Massachusetts, and for obtaining money, by means of false and fraudulent pretenses, representations and promises.

3.    The scheme and artifice to defraud and for obtaining money through false and fraudulent pretenses, representations and promises, included the defendants IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI preparing and signing prescriptions and other documents requesting and prescribing unnecessary diagnostics tests, and containing false statements about symptoms, complaints and clinical data, preparing false reports of diagnostic tests, signing reports of tests not done and not reviewed, and affixing a stamped signature to documents and reports without authorization or authority, submitting and causing others to submit letters and certifications to insurance companies certifying the accuracy and completeness of false documents, and requesting payment based on these and other false representations, when defendants IGOR MOYSEYEV, SEVERIN YELAUN,

45

DAVID S. TAMAREN and JOHN F. MONTONI knew that said documents, letters, forms and certifications, included false and fraudulent statements and information, and other misrepresentations concerning the treatment, examinations, tests and clinical data pertaining to alleged injured individuals.  The defendants IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI intended thereby to induce the insurance companies to make payments to GLOBAL TECH DIAGNOSTICS and LYNN DIAGNOSTICS MANAGEMENT for the tests that were represented to have been done and analyzed, and the reports that were represented to have been properly reviewed and written.

4.    It was part of the scheme and artifice to defraud and for obtaining money through false and fraudulent pretenses, representations and promises, that the defendants, IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI, submitted, or caused others to submit, documents, letters, forms and information as set forth in paragraphs 27 through 45, above.

5.    On or about the dates listed below, at Boston, in the District of Massachusetts and elsewhere, the defendants,

IGOR MOYSEYEV,
SEVERIN YELAUN,
DAVID S. TAMAREN and
JOHN F. MONTONI,

having devised and intending to devise the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses, representations, and

46

promises, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, and signals, for the purpose of executing such scheme and artifice:

| COUNT | DATE | TYPE OF TRANSMISSION | PARAGRAPH |
|-------|------|----------------------|-----------|
| Thirty-Eight | October 1, 2001 | facsimile | 28(h) |
| Thirty-Nine | March 6, 2000 | facsimile | 32(f) |
| Forty | April 15, 2001 | facsimile | 32(g) |

All in violation of Title 18, United States Code, Sections 1343 and 2.

47

## COUNTS FORTY-ONE
## TITLE 18, UNITED STATES CODE, SECTION 1347
## (HEALTH CARE FRAUD)

1.   Paragraphs 1 through 45, set forth above, are hereby realleged and incorporated as if fully set forth herein.

2.   From in or before January 29, 1999, through in or about 2002, in the District of Massachusetts, and elsewhere,

IGOR MOYSEYEV,
SEVERIN YELAUN,
DAVID S. TAMAREN and
JOHN F. MONTONI,

the Defendants, having devised and intending to devise a scheme and artifice to obtain, by means of false and fraudulent pretenses, representations, and promises, money under the custody and control of health care benefit programs, in connection with the delivery of or payment for health care benefits, items, or services, did knowingly and willfully execute such scheme by causing to be submitted false claims for services that had not been provided.

All in violation of Title 18, United States Code, Section 1347.

48

**COUNT FORTY-TWO**
**TITLE 18, UNITED STATES CODE, SECTION 371**
**(CONSPIRACY)**

1.    Paragraphs 1 through 45, set forth above, are hereby realleged and incorporated as if fully set forth herein.

2.    From in or before January, 1999, and continuing to in or about 2003, in the District of Massachusetts, and elsewhere, the defendants,

IGOR MOYSEYEV,
SEVERIN YELAUN,
DAVID S. TAMAREN and
JOHN F. MONTONI,

did knowingly and intentionally combine, conspire, confederate and agree with each other, to commit offenses against the United States, that is, Mail Fraud in violation of Title 18, United States Code, Sections 1341, Wire Fraud in violation of Title 18, United States Code, Section 1343, and Health Care Fraud in violation of  Title 18, United States Code, Section 1347.

3.    It was part of the conspiracy that the defendants made false representations and promises, in that the defendants IGOR MOYSEYEV, SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI prepared and signed prescriptions and other documents requesting and prescribing unnecessary diagnostics tests, and containing false statements about symptoms, complaints and clinical data, preparing false reports of diagnostic tests, signed reports of tests not done and not reviewed, and affixed a stamped signature to documents and reports without authorization or authority,

49

submitted and caused others to submit letters and certifications
to insurance companies certifying the accuracy and completeness
of false documents, and requested payment based on these and
other false representations, when defendants IGOR MOYSEYEV,
SEVERIN YELAUN, DAVID S. TAMAREN and JOHN F. MONTONI knew that
said documents, letters, forms and certifications, included false
and fraudulent statements and information, and other
misrepresentations concerning the treatment, examinations, tests
and clinical data pertaining to alleged injured individuals.  The
Defendants intended thereby to induce insurance companies to make
payments to GLOBAL TECH and LYNN DIAGNOSTICS for these tests
purportedly done, in violation of Title 18, United States Code,
Sections 1341 and 1343, and Title 18, United States Code, Section
1347.

        4.    In furtherance of the conspiracy and to achieve the
objects thereof, the defendants committed and caused to be
committed, in the District of Massachusetts and elsewhere, the
following overt acts, among others:

            1.    In or about early 1999, the exact date being
unknown, the Defendant JOHN MONTONI prepared and signed an
undated prescription for "EMG/NCV lower ext," that is,
prescribing EMG and NCV testing of the lower extremities of
Miguel Berrios.

2.   In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed the stamped signature of Doctor A to certain forms dated February 19, 1999, including a "Request for Electrodiagnostic Tests" dated February 19, 1999 that contained a description of "Clinical Data (Diagnoses, Necessity for the Test)" and requested an EMG and NCV of the lower extremities for Miguel Berrios, and a second similar form, on the letterhead of GLOBAL TECH DIAGNOSTICS.  Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

3.   In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed the stamped signature of Doctor A to a three page report of the EMG and NCV tests, that were purportedly conducted on February 21, 1999, on Miguel Berrios. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.  Further, the EMG tests were not done on Miguel Berrios, as represented by the documents.

4.   In or about early 1999, the exact date being unknown, an employee of GLOBAL TECH DIAGNOSTICS submitted a Health Insurance Claim Form to Safety Insurance Company, dated February 21, 1999, seeking payment of $1598.24 for EMG and NCV

51

testing on Miguel Berrios. The information on the Form
represented that the referring physician was Doctor A, whose
stamped signature was placed on several forms concerning Miguel
Berrios. The Claim Form was received by Safety on or about April
21, 1999.

5.   On or about September 7, 1999, an employee of
GLOBAL TECH, identifying himself as "Billing Department," sent a
letter to Safety Insurance Company on behalf of GLOBAL TECH
DIAGNOSTICS. The letter referenced Miguel Berrios and
"[e]nclosed ... a bill and medical record for treatment
rendered." The letter further requested "payment at your
earliest convenience." GLOBAL TECH also supplied an affidavit
that was signed by the employee, certifying that the "attached
bills, records, and/or reports concerning services rendered to
Berrios Miguel be true and complete and that the charges
therefore are fair and reasonable."

6.   On or about April 11, 2000, Symco Medical Billing,
Inc., (hereinafter "Symco") acting as a collection agent for
GLOBAL TECH, sent a letter to Safety Insurance. The letter
included "executed liens, signed affidavits and medical bills for
.... Miguel Berrios [who] currently has an outstanding balance as
follows: $1,598.24 - for GLOBAL TECH DIAGNOSTICS."

7.   On or about May 15, 2000, one or more of the
Defendants or someone acting on behalf of GLOBAL TECH and the

Defendants received and deposited a check from Safety Insurance
Company on May 15, 2000, for Miguel Berrios, in the amount of
$1573.24.

8.   In or about early 1999, the exact date being
unknown, one or more of the Defendants or someone acting on their
behalf, prepared a document, and affixed thereto the stamped
signature of Doctor A, the document being an undated form on
GLOBAL TECH letterhead, requesting EMG and NCV testing of the
upper extremities for John Fusi.  Doctor A never prepared nor
read the document, and never authorized another to use his stamp
in this manner.

9.   In or about early 1999, the exact date being
unknown, one or more of the Defendants or someone acting on their
behalf, prepared a document, and affixed thereto the stamped
signature of Doctor A, the document being a report of the tests
purportedly conducted on John Fusi on February 20, 1999.  Doctor
A never prepared nor read the documents, and never authorized
another to use his stamp in this manner.  Further, the EMG tests
were not done on John Fusi, as represented by the documents.

10.   In or about early 1999, the exact date being
unknown, one or more of the Defendants or someone acting on their
behalf, prepared a "Health Insurance Claim Form" to Safety
Insurance Company, requesting payment of $1358.26 for EMG and NCV
testing on John Fusi, conducted on February 20, 1999.  The Form

represented that the referring physician was the Doctor A, whose
stamped signature was placed on the forms submitted in connection
with the alleged treatment of John Fusi.  The Form was mailed to
Safety.

11.  On or about September 7, 1999, an employee of
GLOBAL TECH, identifying himself as "Billing Department," sent a
letter to Safety Insurance on behalf of GLOBAL TECH DIAGNOSTICS.
The letter referenced John Fusi and "[e]nclosed ... a bill and
medical record for treatment rendered."  The letter further
requested "payment at your earliest convenience."  The employee,
on behalf of GLOBAL TECH, also supplied an affidavit that was
signed by the employee, certifying that the "attached bills,
records, and/or reports concerning services rendered to John Fusi
be true and complete and that the charges therefore are fair and
reasonable."

12.  On or about October 1, 1999, one or more of the
Defendants or an individual acting on their behalf and GLOBAL
TECH deposited the Safety Insurance Company in the amount of
$1358.26, for services to John Fusi, into GLOBAL TECH's bank
account.  The check from Safety was issued on September 23, 1999,
and an individual stamped the back of the check: "for deposit
only GLOBAL TECH DIAGNOSTICS, Inc."

13.  In or about early 1999, the exact date being
unknown, one or more of the defendants, or someone acting on

54

their behalf, prepared and affixed Doctor A's stamped signature
to an undated form on GLOBAL TECH letterhead, requesting EMG and
NCV testing of the upper extremities for Donnie Lago. Doctor A
never prepared nor read the documents, and never authorized
another to use his stamp in this manner.

14.   In or about early 1999, the exact date being
unknown, one or more of the defendants, or someone acting on
their behalf, prepared and affixed Doctor A's stamped signature
to a report of the EMG and NCV tests purportedly conducted on
February 21, 1999, on Donnie Lago. Doctor A never prepared nor
read the documents, and never authorized another to use his stamp
in this manner. Further, the EMG tests were not done on Donnie
Lago, as represented by the documents.

15.   In or about early 1999, the exact date being
unknown, one or more of the defendants, or someone acting on
their behalf, prepared and mailed to Middlesex Insurance Company
a "Health Insurance Claim Form," requesting payment to GLOBAL
TECH of $1358.26 for EMG and NCV testing on Donnie Lago,
conducted on February 20, 1999. The information on the Claim
Form represented that the referring physician was Doctor A whose
stamped signature appears on a number of documents submitted in
connection with the alleged testing on Donnie Lago.

16.   On or about May 26, 1999, an employee of GLOBAL
TECH, identifying herself as "Billing Department," sent a letter

55

to Middlesex Insurance Company, on behalf of GLOBAL TECH,
requesting payment for services rendered to Donnie Lago.  The
letter also enclosed an affidavit from the employee certifying
the correctness and accuracy of the charges.

17.  On or about August 1, 1999, one or more of the
defendants or someone acting on their behalf, deposited the check
from Middlesex Insurance for services to Donnie Lago, into the
bank account of GLOBAL TECH.  The defendant IGOR MOYSEYEV signed
the back of the check.

18.  In or about early 1999, the exact date being
unknown, the Defendant DAVID TAMAREN prepared and signed a
prescription dated February 25, 1999, prescribing EMG testing of
the upper extremities for Inna Shtyrkov.

19.  In or about early 1999, the exact date being
unknown, the Defendant DAVID TAMAREN prepared and signed an
undated request for an EMG and NCV of the upper extremities for
Inna Shtyrkov.

20.  In or about early 1999, the exact date being
unknown, one or more of the defendants, or someone acting on
their behalf, prepared and affixed thereto the stamped signature
of Doctor A, to a report of NCV and EMG tests purportedly
conducted on February 27, 1999, on Inna Shtyrkov.  Doctor A never
prepared nor read the documents, and never authorized another to
use his stamp in this manner.  Further, the EMG tests were not

56

done on Inna Shtyrkov, as represented by the documents.

21.   In or about early 1999, the exact date being unknown, one or more of the defendants, or someone acting on their behalf, prepared and mailed to Liberty an undated Health Insurance Claim Form, seeking payment in the amount of $1358.26 for NCV and EMG testing on Inna Shtyrkov, conducted on March 13, 1999.   According to the Claim Form the referring physician was the Defendant DAVID TAMAREN.

22.   On or about October 1, 2001, Symco sent, by facsimile transmission, to an attorney representing Inna Shtyrkov, a cover sheet and referenced documents, including a "certified bill with attached medical records for the above named patient for visit to GLOBAL TECH DIAGNOSTICS."   The patient named is Inna Shtyrkov.   The attached documents include a certification from an employee of Symco, certifying that the attached billing statement in the amount of $1356.26 is true and complete.   The billing that was attached was the Health Insurance Claim Form described above, seeking $1358.26 for EMG and NCV testing on Shtyrkov on March 13, 1999.

23.   Defendant DAVID TAMAREN also wrote prescriptions for various durable medical goods, including a TENS Unit, an orthopedic car seat, a cervical collar and a cervical pillow, for which (on February 25, 1999), Monroe Medical Services, Inc. billed Liberty; some of these items were never received by Inna

57

Shtyrkov.

24.   On or about February 10, 2000, one or more of the
Defendants or someone acting on their behalf received and
deposited a check from Liberty in the amount of $454.89 for
services to Inna Shtyrkova.

25.   On or about October 8, 1998, the Defendant DAVID
TAMAREN prepared and signed a prescription, prescribing NCV and
EMG testing of the upper and lower extremities of Martha Casco.

26.   On or about November 12, 1998, the Defendant
TAMAREN prepared and signed a prescription for NCV and EMG
testing of the lower extremities for Casco.

27.   On or about November 14, 1998, the Defendant DAVID
TAMAREN prepared and signed a request for an EMG and NCV of the
upper and lower extremities for Martha Casco.

28.   In or about late 1998, the exact date being
unknown, one or more of the Defendants, or someone acting on
their behalf, prepared a document, and affixed thereto the
stamped signature of Doctor A, said document purporting to be a
report of EMG and NCV testing purportedly done on Martha Casco on
November 14, 1998.   Doctor A never prepared nor read the
documents, and never authorized another to use his stamp in this
manner.   Further, the EMG tests were not done on Martha Casco as
represented by the documents.

29.    In or about late 1998, the exact date being
unknown, one or more of the Defendants or someone acting on their
behalf, prepared and mailed to Commercial Union a Health
Insurance Claim Form, seeking payment in the amount of $2718.56
for NCV and EMG testing purportedly conducted on November 14,
1998, on Martha Casco.    According to the Claim Form, dated
December 12, 1998, the referring physician was the Defendant
DAVID TAMAREN.

30.    On or about October 11, 2001, an employee of
GLOBAL TECH, and on behalf of the Defendants, sent a letter to
Commerce Insurance Company.    The letter referenced Martha Casco
and "[e]nclosed... all medical bills and notes from November 14,
1998 for GLOBAL TECH DIAGNOSTICS".

31.    In or about late 1999 or early 2000, the exact
date being unknown, the Defendant JOHN MONTONI prepared and
signed an undated prescription requesting both an EMG and NCV of
the lower extremities on Serena Dos.

32.    In or about 1999, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV of the lower extremities for Serena
Dos.

33.    In or about early 1999, the exact date being
unknown, one of the Defendant, or someone acting on their behalf,
prepared a document, and affixed thereto the stamped signature of

59

Doctor A, said document purporting to be a report, dated February 27, 1999, of EMG and NCV tests purportedly conducted on Serena Dos. Doctor A did not do the tests, did not prepare or review the report and did not authorize anyone to use his signature stamp in this manner. Serena Dos was not given the tests as described.

34. In or about early 1999, the exact date being unknown, one of the Defendants, or someone acting on their behalf, prepared and mailed a Health Insurance Claim Form to Fitchburg, seeking payment in the amount of $1598.24 to GLOBAL TECH for NCV and EMG testing purportedly conducted on Serena Dos on March 13, 1999. According to the undated Claim Form the referring physician was the Defendant DAVID TAMAREN.

35. In or about early 2000, the exact date being unknown, one of the Defendants, or someone acting on their behalf, prepared and mailed a second Health Insurance Claim Form on behalf of GLOBAL TECH to the Fitchburg Mutual, again seeking payment in the amount of $1598.24 for NCV and EMG testing conducted on February 27, 1999 on Serena Dos. The second form was dated May 24, 2000. According to the second Claim Form the referring physician was Defendant JOHN MONTONI.

36. On or about May 24, 2000, Symco on behalf of GLOBAL TECH, over the signature of an employee identified as "Medical Biller," mailed a letter Fitchburg Mutual Insurance.

The letter referenced Serena Dos and "[e]nclosed... itemized bills and corresponding medical records, for services rendered to this patient...please issue payment to the above provider". The amount of the bill was $1598.24.

37.   On or about May 24, 2000, Symco, on behalf of GLOBAL TECH, mailed a letter to an attorney representing Ms. Dos, concerning the balance owed to GLOBAL TECH for services.

38.   On or about June 13, 2000, Symco, on behalf of GLOBAL TECH, mailed a letter to an attorney representing Serena Dos, and attached a copy of the letter it received dated June 6, 2000. A "Collector" for Symco asked to include the balance owed to GLOBAL TECH in any settlement of the Dos case.

39.   In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed thereto the stamped signature of Dr. A, to an undated request for electro-diagnostic tests for an EMG and NCV of the lower extremities of Christopher Zombrano. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

40.   In or about early 1999, the exact date being unknown, Defendant JOHN MONTONI prepared and signed an undated prescription for an EMG and NCV of the lower extremities for Christopher Zombrano.

41.    In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and affixed thereto the stamped signature of Dr. A, to report for the EMG and NCV testing dated February 20, 1999, on Zombrano.  Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner. Further, the testing was never done on Zombrano as represented in the report.

42.    In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty a Health Insurance Claim Form, seeking payment to GLOBAL TECH in the amount of $1598.24 for NCV and EMG testing conducted on February 20, 1999, on Christopher Zombrano.  According to the Claim Form, dated January 1, 1997 (sic), the referring physician was Doctor A.

43.    On or about May 26, 1999, a member of the "Billing Department of GLOBAL TECH, sent a letter to Liberty Mutual.  The letter referenced Christopher Zombrano and "[e]nclosed... a bill and medical record for services rendered."  GLOBAL TECH also supplied an affidavit that was signed by a "Billing Agent," certifying that the "attached bills, records, and/or reports concerning services rendered to Zombrano be true and complete and that the charges therefore are fair and reasonable."

44. On or about January 28, 2000, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

45. On or about February 19, 2001, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

46. On or about March 20, 2001, a "Collector" for Symco, on behalf of GLOBAL TECH, mailed a letter to a lawyer representing several clients, including Christopher Zombrano, seeking payment for several providers, including $1598.24 owed to GLOBAL TECH for services to Zombrano.

47. In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf prepared a document, dated February 19, 1999, and affixed thereto the stamped signature of Dr. A, said document being a "Request for Electrodiagnostic Tests." The form contains a description of "Clinical Data (Diagnoses, Necessity for the Test)" and requests an EMG and NCV of the upper extremities of Juan Agosto. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

63

48.   In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf prepared a document and affixed thereto the stamped signature of Dr. A, said document being a three page report of the EMG/NCV tests, that were purportedly conducted on February 21, 1999, on Juan Agosto.  Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.  Further, the testing was never done on Agosto as represented in the report.

49.   On or about February 21, 1999, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Holyoke a Health Insurance Claim Form, dated February 21, 1999, seeking payment of $1358.26 for GLOBAL TECH for EMG and NCV testing on Juan Agosto.  According to the Claim Form the referring physician was Dr. A.

50.   On or about June 15, 1999, the Defendant MOYSEYEV received and deposited a check from Holyoke Mutual Insurance Company for Juan Agosto, in the amount of $1358.26.  The back of the check bears the signature of the Defendant MOYSEYEV.

51.   In or about late 1998, the exact date being unknown, the Defendant DAVID TAMAREN, signed a "Request for Electrodiagnostics Tests," dated November 14, 1998, requesting EMG and NCV testing of both the upper and lower extremities for Maria Lizardi.

64

52.   In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on Maria Lizardi on November 14, 1998, and affixed thereto the stamped signature of Dr. A.   Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner.   Further, the testing was never done on Lizardi as represented in the report.

53.   In or about late 1998, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Plymouth Insurance Company a Health Insurance Claim Form, dated December 12, 1998, seeking payment of $2718.56 to GLOBAL TECH, for EMG and NCV testing of Maria Lizardi, purportedly conducted on November 14, 1998.   According to the Claim Form the referring physician was the Defendant DAVID TAMAREN.

54.   On or about January 12, 1999, a member of the "Billing Department" at GLOBAL TECH mailed an unsigned letter to Plymouth, dated January 12, 1998 (sic), that was written on their letterhead, requesting payment for services rendered to Maria Lizardi, rendered on "11-14-98."   Also sent, was an affidavit from the "Accounting Manager," dated January 14, 1998 (sic), certifying the correctness and accuracy of the charges.

65

55.   On or about February 1, 1999, the Defendant MOYSEYEV received and deposited a check from Plymouth Insurance Company on February 1, 1999, for Maria Lizardi, in the amount of $2718.56.

56.   In or about late 1998, the exact date being unknown, the Defendant DAVID TAMAREN signed a form "Request for Electrodiagnostics Tests," dated November 14, 1998, requesting EMG and NCV testing of both the upper and lower extremities for Hermina Martinez.

57.   In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on Hermina Martinez on November 14, 1998, and affixed thereto the stamped signature of Dr. A.   Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner.   Further, the testing was never done on Martinez as represented in the report.

58.   In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Plymouth Insurance, a Health Insurance Claim Form, dated December 12, 1998, seeking payment to GLOBAL TECH of $2718.56, for EMG and NCV testing of Herminia Martinez, conducted on November 14, 1998.   According to the Claim

66

Form the referring physician was the Defendant DAVID TAMAREN.

59. On or about January 12, 1999, a member of the "Billing Department" at GLOBAL TECH mailed an unsigned letter to Plymouth, dated January 12, 1998 (sic), that was written on their letterhead, requesting payment for services rendered to Hermina Martinez on November 14, 1998. Also sent, was an affidavit signed by the "Accounting Manager," dated January 14, 1998 (sic), certifying the correctness and accuracy of the charges.

60. On or about February 1, 1999, the Defendant MOYSEYEV received and deposited a check from Plymouth Insurance Company on February 1, 1999, for Hermina Martinez, in the amount of $2718.56.

61. In or about late 1998, the exact date being unknown, the Defendant JOHN MONTONI prepared and signed an undated prescription requesting an EMG and NCV of the upper and lower extremities for Michelle Mulley.

62. In or about late 1998, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed a prescription dated December 17, 1998, requesting an EMG of the lower extremities for Michelle Mulley.

63. In or about late 1998, the exact date being unknown, the Defendant DAVID TAMAREN signed a request, dated November, 14, 1998, for an EMG and NCV of both the upper and lower extremities for Michelle Mulley.

67

64. In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on Michelle Mulley on November 14, 1998, and affixed thereto the stamped signature of Dr. A. Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner. Further, the testing was never done on Mulley as represented in the report.

65. In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Commerce Insurance, a Health Insurance Claim Form, seeking payment to GLOBAL TECH of $2718.56, for EMG and NCV testing of Michelle Mulley, conducted on November 14, 1998. According to the Claim Form the referring physician was the Defendant DAVID TAMAREN.

66. In or about early, 1999, a member of the "Billing Department" of GLOBAL TECH, sent an undated letter to Commerce Insurance Company, that referenced Michelle Mulley and "[e]nclosed... a bill and medical record for services rendered." The submission also included an affidavit that was signed by an "Accounting Manager," certifying that the "attached bills, records, and/or reports concerning services rendered to Michelle Mulley be true and complete and that the charges therefore are

68

fair and reasonable."

67. On or about June 4, 1999, the Defendant MOYSEYEV received and deposited a check from Commerce for services purportedly rendered to Michelle Mulley, in the amount of $208.00. The Defendant MOYSEYEV signed the back of the check before depositing it into GLOBAL TECH's bank account.

68. In or about early 1999, the exact date being unknown, one or more of the Defendants or someone acting on their behalf prepared a document and affixed thereto the stamped signature of Dr. A, said document requesting electrodiagnostic tests for George Rossi. The undated form contains a description of clinical data and requests an EMG and NCV of the lower extremities of George Rossi. Doctor A never prepared nor read the documents, and never authorized another to use his stamp in this manner.

69. In or about early 1999, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on George Rossi on February 20, 1999, and affixed thereto the stamped signature of Dr. A. Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner. Further, the testing was never done on Rossi as represented in the report.

69

70. On or about February 20, 1999, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Safety, a Health Insurance Claim Form, seeking payment to GLOBAL TECH of $1598.24, for EMG and NCV testing of George Rossi, conducted on March 6, 1999. According to the Claim Form the referring physician was Dr. A.

71. On or about May 26, 1999, a member of the "Billing Department" at GLOBAL TECH, sent a letter to Safety Insurance Company, that referenced George Rossi and "[e]nclosed ... a bill and medical record for treatment rendered." The letter further requested "payment at your earliest convenience." The submission also included an affidavit that was signed by a "Billing Agent," certifying that the "attached bills, records, and/or reports concerning services rendered to George Rossi be true and complete and that the charges therefore are fair and reasonable."

72. On or about June 28, 1999, the Defendant MOYSEYEV received and deposited into the GLOBAL TECH account, a check from Safety Insurance Company for "Berrios Miguel," in the amount of $1573.24. (Miguel Berrios was the insured on the Rossi claim.) The Defendant endorsed the back of the check before depositing it.

73. On or about February 19, 1999, one or more of the Defendants or someone acting on their behalf, prepared an undated and unsigned "Request for Electrodiagnostic Tests" form that

70

requests EMG and NCV testing on the upper extremities of Maria Rossi.

74.  On or about February 20,1999, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on Maria Rossi on February 20, 1999.  Below the signature line was the typed name of Dr. A.  Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner.  Further, the testing was never done on Rossi as represented in the report.

75.  In or about early 1999, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Safety, a Health Insurance Claim Form, seeking payment to GLOBAL TECH of $1358.26, for EMG and NCV testing of Maria Rossi, conducted on February 20, 1999. According to the Claim Form the referring physician was Dr. A.

76.  On or about June 7, 1999, a "Billing Agent" for GLOBAL TECH prepared and mailed to Safety an affidavit, dated June 7, 1999, certifying the accuracy of bills submitted concerning services to Maria Rossi.

77.  On or about June 28, 1999, the Defendant MOYSEYEV received and deposited into the GLOBAL TECH account, a check from Safety Insurance Company for "Berrios Miguel," in the amount of $1333.26.  (Miguel Berrios was the insured on the Rossi claim.)

The Defendant endorsed the back of the check before depositing it.

78.    In early 1999, one or more of the Defendants or someone acting on their behalf, prepared an undated document requesting EMG and NCV testing of the upper extremities on Juan Suazo, and affixed thereto the stamped signature of Dr. A.  Dr. A never read nor prepared the document, nor authorized anyone to use his signature stamp in this manner.

79.    In or about early 1999, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be report of the EMG and NCV tests on Juan Suazo on February 20, 1999, and affixed thereto the stamped signature of Dr. A.  Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner.  Further, the testing was never done on Rossi as represented in the report.

80.    In or about early 1999, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Safety, a Health Insurance Claim Form, dated February 20, 1999, seeking payment to GLOBAL TECH of $1358.26, for EMG and NCV testing of Juan Suazo, conducted on February 21, 1999.  According to the Claim Form the referring physician was Dr. A.

72

81.   On or about May 26, 1999, a member of the "Billing Department" of GLOBAL TECH, prepared and mailed a letter to the Safety Insurance Company.  The letter referenced Juan Suazo and "[e]nclosed... a bill and medical record for services rendered." The submission also included an affidavit that was signed by a "Billing Agent," certifying that the "attached bills, records, and/or reports concerning services rendered to Juan Suazo be true and complete and that the charges therefore are fair and reasonable."

82.   On or about June 28, 1999, the Defendant MOYSEYEV received and deposited into the GLOBAL TECH account, a check from Safety Insurance Company for "Berrios Miguel," in the amount of $1333.  (Miguel Berrios was the insured on the Suazo claim.)  The Defendant endorsed the back of the check before depositing it.

83.   In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared a document that purported to be a report of the EMG and NCV tests on Ovidio Merida on November 14, 1998, and affixed thereto the stamped signature of Dr. A.  Doctor A never prepared nor read the document, never conducted the tests as described, and never authorized another to use his stamp in this manner.  Further, the testing was never done on Merida as represented in the report.

73

84.  In or about late 1998, the exact date being unknown, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Commerce Insurance, a Health Insurance Claim Form, dated December 12, 1998, seeking payment to GLOBAL TECH of $2718.56, for EMG and NCV testing of Ovidio Merida, conducted on November 14, 1998.  According to the Claim Form the referring physician was the Defendant DAVID TAMAREN.

85.  In or about late 1998, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed a request dated November 14, 1998, for an EMG and NCV of the upper and lower extremities for Ovidio Merida.

86.  On or about November 6, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription, prescribing an EMG test on Wynter Plunkett.

87.  Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of the lower extremities on Wynter Plunkett.

88.  On November 6, 1999, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of the EMG and NCV testing purported to have been performed on Wynter Plunkett.  The EMG tests were not done on Wynter Plunkett as represented by the documents.

74

89.  On or about December 13, 1999, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty Mutual a Health Insurance Claim Form, seeking payment in the amount of $1318.00 for NCV and EMG testing purportedly conducted on November 6, 1999, on Wynter Plunkett.  According to the Claim Form, dated December 13, 1999, the referring physician was the Defendant DAVID TAMAREN and the physician providing the testing was the Defendant MONTONI.

90.  On or about December 14, 1999, LYNN DIAGNOSTICS, through Symco Medical Billing, Inc. over the signature of an individual identified as a "Medical Biller" submitted a bill to Liberty Mutual Insurance Company in the amount of $1318.00 for services to Wynter Plunkett on November 6, 1999.

91.  On or about March 6, 2000, GLOBAL TECH, through Symco Medical Billing, faxed the bill identified in the preceding paragraph with the following language attached: "enclosed are the bill and notes for Wynter Plunkett who treated at Lynn Diagnostic Management, Inc."

92.  On April 15, 2001, the bill in the amount of $1318.00 for services to Wynter Plunkett was once again faxed to Liberty Mutual Insurance Company by a principal of LYNN DIAGNOSTICS MANAGEMENT INC. from an Ashland, Massachusetts address.

93. On or about December 13, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription, prescribing an EMG and NCV test on Jose Grullon for his right upper and lower extremities. Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for a Physician's Order For Diagnostic Exam/Test for Jose Grullon. All boxes that would identify what tests were to be conducted and which extremities tested were left blank. This request was made on letterhead of LYNN DIAGNOSTICS

94. Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG of the right upper extremity and left and right lower extremity and an NCV of the left lower extremity and upper extremities, for Jose Grullon.

95. On or about December 18, 1999, the Defendant MONTONI affixed his signature to a document, said document purportedly being an EMG and NCV report purported to have been performed on Jose Grullon. The EMG tests were not done on Jose Grullon as represented by the documents.

96. On or about February 11, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to CU Homeland Insurance a Health Insurance Claim Form, seeking payment in the amount of $2494.00 for NCV and EMG testing purportedly conducted on December 18, 1999 on Jose Grullon.

76

According to the Claim Form, dated December 18, 1999, the referring physician was the Defendant TAMAREN, and the doctor providing the testing was the Defendant MONTONI.

97.   On or about March 6, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to CU Homeland Insurance a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of $2494.00 for NCV and EMG testing purportedly conducted on December 18, 1999 on Jose Grullon.   According to the Claim Form, dated March 6, 2000, the referring physician was the Defendant DAVID TAMAREN and the physician who provided the testing was the Defendant JOHN MONTONI.

98.   On or about March 17, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Blue Cross Blue Shield of Massachusetts a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of $2494.00 for NCV and EMG testing purportedly conducted on December 18, 1999 on Jose Grullon.   According to the Claim Form, dated March 17, 2000, the referring physician was the Defendant DAVID TAMAREN and the physician who provided the testing was the Defendant JOHN MONTONI.

99.   On or about December 16, 1999, the defendant DAVID TAMAREN prepared and signed a prescription for an EMG and NCV for Claudia Batia.

77

100.  Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of both upper extremities on Claudia Batia.

101.  On or about December 18, 1999, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on behalf of Claudia Batia.  The EMG tests were not done on Claudia Batia as represented by the documents.

102.  On or about January 3, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Trust Insurance a Health Insurance Claim Form, seeking payment in the amount of $1352.00 to LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on December 18, 1999 on Claudia Batia.  According to the Claim Form, dated January 3, 2000, the referring physician was the Defendant DAVID TAMAREN and the physician providing the testing was the Defendant MONTONI.

103.  As part of the submissions in the Batia file, an individual signed and mailed to Trust Insurance an affidavit, dated March 15, 2000, certifying the accuracy of the bills submitted by LYNN DIAGNOSTICS for services rendered.

104.  In or about November 1999, the Defendant DAVID TAMAREN signed an undated request for EMG and NCV testing of both lower extremities of Yicauri Rodriguez.  Defendant DAVID TAMAREN

also signed an undated prescription prescribing EMG testing of
Rodriguez.

105.    In or about November 1999, the Defendant JOHN
MONTONI signed a document purporting to be a report of EMG and
NCV testing done on Rodriguez on November 6, 1999.

106.    On or about December 13, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Liberty a Health Insurance Claim Form seeking payment of
$1318, for EMG and NCV testing on Yicauri Rodriguez, purportedly
conducted on November 6, 1999.  The form identified the referring
physician as the defendant DAVID TAMAREN and the physician
conducting the tests as Defendant JOHN MONTONI.

107. On or about February 10, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Liberty a Health Insurance Claim Form seeking payment of
$1318, for EMG and NCV testing on Yicauri Rodriguez, purportedly
conducted on November 6, 1999.  The form identified the referring
physician as the defendant DAVID TAMAREN and the physician
conducting the tests as Defendant JOHN MONTONI.

108.    On or about November 21, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Liberty a letter seeking payment of $1318 for services
rendered by LYNN DIAGNOSTICS to Rodriguez.

109.   On December 14, 1999, a "Medical Biller" for Symco, drafted and mailed to Liberty bills and medical records, seeking payment of $1318 to LYNN DIAGNOSTICS, for services to Yicauri Rodriguez.

110.   On or about February 8, 2000, a "Medical Collections Specialist" for Symco, drafted and mailed to Liberty a letter seeking payment of $1318 for services rendered by LYNN DIAGNOSTICS to Rodriguez.

111. On or about February 10, 2000, one or more of the Defendants or someone acting on their behalf prepared and mailed to Liberty a Health Insurance Claim Form seeking payment of $1318 to LYNN DIAGNOSTICS for testing purportedly done on Rodriguez on November 6, 1999.   The form identified the referring physician as TAMAREN and the physician providing the testing as MONTONI.

112.   On or about February 11, 2000, a "Medical Biller" for Symco, drafted and mailed to Liberty a letter and enclosed copies of bills and other records, seeking payment of $1318 for the services to Yicauri Rodriguez.

113.   On or about February 11, 200, a "Medical Biller" for Symco, drafted and mailed to an attorney representing Rodriguez, a letter and enclosed copies of bills and other records, seeking payment of $1318 for the services to Yicauri Rodriguez.

80

114.  In late 1999, the Defendant DAVID TAMAREN signed a request for EMG and NCV testing of the lower left extremities of Elvia Gomez.  Defendant DAVID TAMAREN also signed an undated prescription for EMG testing.

115.  In late 1999, the Defendant JOHN MONTONI signed a document purporting to be a report of EMG and NCV testing of Elvia Gomez, done on November 6, 1999.

116.  On or about December 13, 1999, one or more of the Defendants or someone acting on their behalf prepared and mailed to Commerce a Health Insurance Claim Form, dated December 13, 1999, seeking payment of $1318, for EMG and NCV testing on Gomez, purportedly conducted on November 6, 1999.  The referring physician was identified as the Defendant DAVID TAMAREN, and the physician providing the testing was identified as the Defendant JOHN MONTONI.

117.  Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated prescription for an EMG for William Baez.

118.  On or about November 19, 1999, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of the right upper and lower extremities of William Baez.

119.  Sometime in 1999, the exact date being unknown, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing

purported to have been performed on William Baez.  The EMG tests
were not done on William Baez as represented by the documents.

120.   On or about December 14, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Metropolitan Insurance a Health Insurance Claim Form, seeking
payment in the amount of $2254.00 to LYNN DIAGNOSTICS for NCV and
EMG testing purportedly conducted on November 19, 1999 on William
Baez.  According to the Claim Form, dated December 14, 1999, the
referring physician was the Defendant DAVID TAMAREN and the
physician providing the testing was identified as the Defendant
JOHN MONTONI.

121.   On December 13, 1999, LYNN DIAGNOSTICS MANAGEMENT
through Symco Medical Billing, Inc. over the signature of an
individual identified as a "Medical Biller" submitted a bill to
Metropolitan Insurance Company in the amount of $2254.00 for
services to William Baez.

122.   On or about November 21, 1999, an employee of
LYNN DIAGNOSTICS, identifying himself being from the "Billing
Department" and on behalf of the Defendants, sent a letter to
Metropolitan Insurance Company on behalf of Lynn Diagnostic
Management.   The letter referenced William Baez and "[e]nclosed
... a bill and medical record for the servises [sic] rendered."
The letter further requested "payment at your earliest
convenience."

123.    In or about November 1999, the Defendant DAVID
TAMAREN signed an undated request for EMG and NCV testing of the
upper and lower extremities (left and right) of Gonzalo Robles.
DAVID TAMAREN also signed an undated prescription for EMG
testing.

124.    In or about November 1999, the Defendant JOHN
MONTONI signed a document purporting to be a report of EMG and
NCV testing of Gonzalo Robles, done on November 6, 1999.

125.    On or about December 13, 1999, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Safety Insurance Company a Health Insurance Claim Form, dated
December 13, 1999, seeking payment of $2548, for EMG and NCV
testing on Robles, purportedly conducted on November 6, 1999.
The referring physician was identified as the Defendant DAVID
TAMAREN, and the physician providing the testing was identified
as the Defendant JOHN MONTONI.

126.    On or about January 5, 2000, an attorney
representing Gonzalo Robles mailed documents to Commerce
Insurance, including a "one page record from LYNN DIAGNOSTICS,
Inc."

127.    On or about November 5, 1999, the Defendant DAVID
TAMAREN prepared and signed a prescription for an EMG for Yudelca
Castillo.

83

128. Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of both left upper extremities for Yudelca Castillo.

129. On or about November 6, 1999, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on behalf of Yudelca Castillo. The EMG tests were not done on Yudelca Castillo as represented by the documents.

130. On or about December 13, 1999, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Liberty Mutual Insurance a Health Insurance Claim Form, seeking payment in the amount of $1352.00 to LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on November 6, 1999 on Yudelca Castillo. According to the Claim Form, dated December 13, 1999, the referring physician was the Defendant DAVID TAMAREN and the physician providing the testing was identified as the Defendant JOHN MONTONI.

131. On or about December 16, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription for an EMG and NCV for Wanda Gonzalez.

132. On or about December 22, 1999, the Defendant DAVID TAMAREN prepared and signed a prescription for an EMG for

Wanda Gonzalez.

133.    On or about April 18, 2000, Arbella Insurance
issued and mailed a check in the amount of $1352.00 as payment
for NCV and EMG testing purportedly conducted on December 22,
1999, on Wanda Gonzalez.  The check was endorsed by one of the
principals of LYNN DIAGNOSTICS, and on behalf of the Defendants.

134.    Sometime in 1999, the exact date being unknown,
the defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV for Wanda Gonzales.

135.    On or about December 22, 1999, the Defendant
MONTONI affixed his signature to a document, said document
purportedly being an EMG and NCV report purported to have been
performed on behalf of Wanda Gonzalez.  The EMG tests were not
done on Wanda Gonzalez.

136.    Sometime in 1999, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
prescription for an EMG and NCV for Quelvis Mendez.

137.    Sometime in 1999, the exact date being unknown,
the defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV of both lower extremities on Quelvis
Mendez.

138.    On or about January 20, 2000, the Defendant JOHN
MONTONI affixed his signature to a document, said document
purportedly being a report of EMG and NCV tetsing purported to

85

have been performed on behalf of Quelvis Mendez.  The EMG tests were not done on Quelvis Mendez as represented by the documents.

139.  On or about January 27, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Fireman's Fund Insurance, a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS in the amount of \$1318.00 for NCV and EMG testing purportedly conducted on January 20, 2000 on Quelvis Mendez.  According to the Form, the physician providing the testing was identified as the Defendant JOHN MONTONI.

140.  Sometime in 1999, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated prescription for an EMG for Elsie Pierre-Louis.

141.  Sometime in 1999, the exact date being unknown, the defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of both the right upper and lower extremities for Elsie Pierre Louis.

142.  On or about November 16, 1999, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on Elsie Pierre-Louis.  The EMG tests were not done on Elsie Pierre-Louis as represented by the documents.

143.  On or about November 21, 1999, an employee of LYNN DIAGNOSTICS, identifying himself as being from the "Billing Department" and on behalf of the Defendants, sent a letter to

86

Safety Insurance Company on behalf of Lynn Diagnostic Management.
The letter referenced Elsie Pierre-Louis and stated that: "I ...
an agent of Lynn Diagnostic Management, hereby certify that the
attached bills, records, and/or reports concerning services
rendered to  Elsie Pierre-Louis be true and complete in that the
Chargers therefore are fair and reasonable ... subscribed and
sworn to under the penalties of perjury this day of 20 October,
1999."  This document is unsigned.

144.   On or about December 13, 1999, LYNN DIAGNOSTICS,
one or more of the Defendants or someone acting on their behalf
prepared and mailed to Safety Insurance a Health Insurance Claim
Form, seeking payment in the amount of $2494.00 for NCV and EMG
testing purportedly conducted on November 16, 1999 on Elsie
Pierre-Louis.  According to the Claim Form, dated December 13,
1999, the referring physician was the Defendant DAVID TAMAREN and
the physician providing the testing was the Defendant MONTONI.

145.   Sometime in 1999, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
prescription for an EMG for Stephanie Martinez.

146.   On or about November 19, 1999, the defendant
DAVID TAMAREN prepared and signed a request for an EMG and NCV of
the lower extremities for Stephanie Martinez.

147.   Sometime in late 1999, the exact date being
unknown, the Defendant JOHN MONTONI affixed his signature to a

87

document, said document purportedly being a report of EMG and NCV
testing purported to have been performed on Stefanie Martinez.
The EMG tests were not done on Stefanie Martinez as represented
by the documents.

148.   On or about December 13, 1999, one or more of the
Defendants or someone acting on their behalf prepared and mailed
to Commerce Insurance a Health Insurance Claim Form, seeking
payment in the amount of $1318.00 for LYNN DIAGNOSTICS for NCV
and EMG testing purportedly conducted on December 13, 1999 on
Stefanie Martinez.  According to the Claim Form, dated November
19, 1999, the referring physician was the Defendant DAVID TAMAREN
and the physician providing the testing was the Defendant
MONTONI.

149.   On or about May 15, 2000, Commerce Insurance
issued and mailed a check in the amount of $1318.00 as payment
for NCV and EMG testing purportedly conducted on November 19,
1999 on Stefanie Martinez.  The check was endorsed by one of the
principals of LYNN DIAGNOSTICS, and on behalf of the Defendants.

150.   On or about January 14, 2000, the Defendant DAVID
TAMAREN prepared and signed a prescription for an EMG and NCV for
Secundino Reyes.

151.   Sometime in 2000, the exact date being unknown,
the Defendant DAVID TAMAREN prepared and signed an undated
request for an EMG and NCV of both the left upper and lower

88

extremities on Secundino Reyes.

152. On or about January 15, 2000, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on Secundino Reyes. The EMG tests were not done on Secundino Reyes as represented by the documents.

153. On or about January 19, 2000, one or more of the Defendants or someone acting on their behalf prepared and mailed to Liberty Mutual Insurance a Health Insurance Claim Form, seeking payment in the amount of $2548.00 for LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on January 15, 2000 on Secundino Reyes. According to the Claim Form, dated January 19, 2000, the referring physician was the Defendant DAVID TAMAREN, and the physician providing the testing was the Defendant MONTONI.

154. On or about January 4, 2000, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on January 4, 2000 on Evelio Valiente. The EMG tests were not done on Evelio Valiente as represented by the documents.

155. On or about January 6, 2000, one or more of the Defendants or someone acting on their behalf prepared and mailed to Commerce Insurance a Health Insurance Claim Form, seeking

89

payment in the amount of $2548.00 for LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on January 4, 2000 on Evelio Valiente. According to the Claim Form, dated January 6,2000,the referring physician was the Defendant DAVID TAMAREN, and the physician providing the testing was the Defendant MONTONI

156.   On or about January 12, 2000, Commerce Insurance issued and mailed a check in the amount of $2548.00 as payment for NCV and EMG testing purportedly conducted on January 4, 2000, on Evelio Valiente.  The check was endorsed by one of the principals of LYNN DIAGNOSTICS, and on behalf of the Defendants.

157.   In or about December 1999, the Defendant DAVID TAMAREN prepared and signed an undated prescription prescribing EMG testing of Paul Musaelyants.

158.   In or about December 1999, the Defendant JOHN MONTONI signed a report of testing purportedly done on Paul Musaelyants on or about December 16, 1999.

159.   On or about December 17, 1999, on or more of the Defendants, or someone acting on their behalf, prepared and mailed to Commerce, a Health Insurance Claim Form, requesting payment of $2548 to LYNN DIAGNOSTICS for services purportedly rendered to Paul Musaelyants on December 16, 1999.  The Form identified the referring physician as the Defendant DAVID TAMAREN and the physician providing the testing as the Defendant JOHN MONTONI.

90

160. On or about December 17, 1999, a "Medical Biller" employed by Symco and on behalf of the Defendants, drafted and mailed to Commerce Insurance a letter requesting payment of $2548 to LYNN DIAGNOSTICS, for services to Paul Musaelyants on December 16, 1999. The letter referenced the enclosed bills and records.

161. On or about January 20, 2000, a "Medical Biller" employed by Symco, drafted and mailed to Commerce a letter requesting payment of $460, to LYNN DIAGNOSTICS, for services to Paul Musaelyants on January 13, 2000. The letter identified an outstanding balance of $3008.

162. In or about December 1999, the Defendant JOHN MONTONI signed an undated report of testing purportedly done on Viktoria Tkach on or about December 16, 1999.

163. In or about December 1999, the Defendant DAVID TAMAREN prepared and signed an undated prescription prescribing EMG testing of Viktoria Tkach.

164. On or about December 17, 1999, one or more of the Defendants, or someone acting on their behalf, prepared and mailed to Commerce, a Health Insurance Claim Form, requesting payment of $2254 to LYNN DIAGNOSTICS for services purportedly rendered to Viktoria Tkach on December 16, 1999. The Form identified the referring physician as the Defendant DAVID TAMAREN and the physician providing the testing as the Defendant JOHN MONTONI.

91

165.    In or about December 1999, an individual acting at the direction of the Defendant YELAUN completed a "Cervical/Lumbar Spine Questionnaire," with information that was provided to her by YELAUN.  On or about December 17, 1999, the Questionnaire was included in documents mailed to Commerce.

166.    On or about December 17, 1999, a "Medical Biller" employed by Symco and on behalf of the Defendants, drafted and mailed to Commerce Insurance a letter requesting payment of $2254 to LYNN DIAGNOSTICS, for services to Viktoria Tkach on December 16, 1999.  The letter referenced the enclosed bills and records.

167.    In or about December 1999, the Defendant DAVID TAMAREN signed an undated prescription prescribing EMG testing of Raisa Tkach.

168.    In or about December 1999, the Defendant JOHN MONTONI signed an undated report of testing purportedly done on Raisa Tkach on December 9, 1999.

169.    On or about December 17, 1999, on or more of the Defendants or someone acting on their behalf, prepared and mailed to Commerce a Health Insurance Claim Form requesting payment of $2548 to LYNN DIAGNOSTICS for services purportedly rendered to Raisa Tkach on December 9, 1999.  The Form identified the referring physician as Defendant DAVID TAMAREN and the physician providing the testing as Defendant JOHN MONTONI.

92

170.   In or about December 1999, an individual acting
at the direction of the Defendant YELAUN completed a
"Cervical/Lumbar Spine Questionnaire," with information that was
provided to her by YELAUN, and signed another's name to the
document.  On or about December 17, 1999, the Questionnaire was
included in documents mailed to Commerce.

171.   On or about December 17, 1999, a "Medical Biller"
employed by Symco drafted and mailed to Commerce a letter seeking
payment of $2548 to LYNN DIAGNOSTICS, for services to Raisa Tkach
on December 9, 1999.  The letter referenced the enclosed bills
and records.

172.   On or about January 20, 2000, a "Medical Biller"
employed by  Symco, drafted and mailed to Commerce a letter
requesting payment of $237, to LYNN DIAGNOSTICS, for services to
Raisa Tkach on January 13, 2000.  The letter identified an
outstanding balance $2785.

173.   On or about November 7, 2000, an attorney
representing Viktoria Tkach, Raisa Tkach and Paul Musaelyants,
drafted and mailed to Commerce a letter requesting of the
Commerce claims adjuster "documentation to support the allegation
that the treatment with LYNN DIAGNOSTICS for the above three
claimants was not 'considered reasonable.'"

174.   On or about January 13, 2000, the Defendant DAVID
TAMAREN signed a prescription prescribing EMG and NCV testing for

93

Gail Famolari. Defendant TAMAREN also signed an undated request
for EMG and NCV testing of the upper and lower extremities for
Famolari.

175. On or about January 8, 2000, the Defendant JOHN
MONTONI signed a report that purported to be the results of the
EMG and NCV tests on Gail Famolari.

176. On or about January 27, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce a Health Insurance Claim Form, dated January 27,
2000, seeking payment of $2494 to LYNN DIAGNOSTICS for EMG and
NCV testing of Famolari on January 8, 2000. The physician who
provided the testing was identified as the Defendant JOHN
MONTONI.

177. On or about January 27, 2000, an employee of
Symco drafted and mailed a letter to Commerce, seeking payment of
$2494 to LYNN DIAGNOSTICS for services to Gale Famolari on
January 8, 2000.

178. On or about March 16, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce a Health Insurance Claim Form, dated March 16, 2000,
seeking payment of $2494 to LYNN DIAGNOSTICS for EMG and NCV
testing of Famolari on January 8, 2000. The physician who
provided the testing was identified as the Defendant JOHN
MONTONI.

179.   On or about March 16, 2000, an employee of Symco drafted and mailed to Commerce a second letter seeking payment of $2494 to LYNN DIAGNOSTICS for services to Gale Famolari on January 8, 2000.

180.   On or about January 6, 2000, the Defendant TAMAREN signed a prescription, prescribing EMG and NCV testing of Ada Mateo.   Defendant DAVID TAMAREN also signed an undated request for EMG and NCV tests of the upper left extremities of Ada Mateo.

181.   On or about February 2, 2000, the Defendant JOHN MONTONI signed a document purporting to be a report of tests conducted on Ada Mateo.

182.   On or about February 10, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Trust Insurance a Health Insurance Claim Form, dated February 10, 2000, seeking payment of $1352 to LYNN DIAGNOSTICS for EMG and NCV testing on Ada Mateo, performed on February 2, 2000.   The Form identified the referring physician as the Defendant DAVID TAMAREN and the physician who performed the tests as the Defendant JOHN MONTONI.

183.   On or about February 10, 2000, a "Medical Biller" for Symco, drafted and mailed to Trust Insurance a letter and attachments, seeking payment of $1352 for services rendered to Ada Mateo by LYNN DIAGNOSTICS.

95

184.   As part of the submissions in the Mateo file, on or about March 15, 2000, an individual signed and  mailed to Trust Insurance that included an affidavit, dated March 15, 2000, certifying the accuracy of the bills submitted by LYNN DIAGNOSTICS for services rendered.

185.   In or about January 2000, the Defendant JOHN MONTONI signed an undated prescription, prescribing EMG and NCV testing for Julie Leyfer.

186.   In January 2000, the Defendant JOHN MONTONI signed a document, purporting to be a report of EMG and NCV testing done on January 8, 2000 on Julie Leyfer.

187.   On or about January 27, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to Commerce a Health Insurance Claim Form, dated January 27, 2000, for EMG and NCV testing of January 8, 2000 on Julie Leyfer. The form identified the doctor providing the testing as the Defendant JOHN MONTONI, and sought payment of $1352.

188.   In January 2000, a "Medical Biller" for Symco, drafted and mailed to Commerce a letter and documentation in an effort to collect for EMG/NCV testing services purportedly provided by LYNN DIAGNOSTICS MANAGEMENT to Julie Leyfer.   The letter requested payment of $1352 to LYNN DIAGNOSTICS for services to Julie Lyfer on January 8, 2000.   The letter referenced enclosed bills and medical records.

96

189.  On or about March 30, 2000, one or more of the
Defendants or someone acting on their behalf, prepared and mailed
to Commerce a Health Insurance Claim Form, dated March 30, 2000,
for EMG and NCV testing of January 8, 2000 on Julie Leyfer.  The
form identified the referring physician as the Defendant TAMAREN
and the doctor providing the testing as the Defendant JOHN
MONTONI, and sought payment of $1352 for LYNN DIAGNOSTICS.

190.  In late 1999, the exact date being unknown, the
defendant, DAVID TAMAREN signed a request for EMG and NCV of the
upper extremities on Nerkis Moreno.  The Defendant TAMAREN also
signed an undated prescription for an EMG test for Moreno.

191.  On or about November 19, 1999, the defendant JOHN
MONTONI signed a document purporting to be a report of EMG and
NCV tests conducted on November 19, 1999 on Nerkis Moreno.

192.  On or about December 13, 1999, one or more of the
defendants, or someone acting on their behalf, prepared and
mailed to Liberty Mutual a Health Insurance Claim Form, seeking
payment of $1352 for the EMG and NCV testing on Nerkis Moreno by
Lynn Diagnostic Management, on November 19, 1999.  According to
the form, the referring physician was TAMAREN and the physician
providing the testing was MONTONI.

193.  In late 1999, the exact date being unknown, the
defendant, DAVID TAMAREN, signed a request for EMG and NCV of the
right upper and lower extremities for Nancy Solano.  The

97

Defendant TAMAREN also signed an undated prescription for an EMG and NCV tests for Solano.

194.    On or about December 18, 1999, the defendant, MONTONI, signed a document purporting to be a report of EMG and NCV tests conducted on December 18, 1999 on Nancy Solano.

195.    On or about November 4, 1999, the defendant DAVID TAMAREN signed a prescription for a cervical collar and pillow.

196.    On or about January 5, 2000, one or more of the defendants, or someone acting on their behalf, prepared and mailed to Liberty Mutual a Health Insurance Claim Form, seeking payment to LYNN DIAGNOSTICS of $2254 for the EMG and NCV testing on Nancy Solano by LYNN DIAGNOSTIC MANAGEMENT, on December 18, 1999.  According to the Claim Form, dated January 5, 2000, the referring physician was the Defendant DAVID TAMAREN and the physician who provided the testing was the Defendant JOHN MONTONI.

197.    On or about January 3, 2000, one or more of the defendants, or someone acting on their behalf, prepared and mailed to Arbella a Health Insurance Claim Form, seeking payment of $2254 for EMG and NCV testing on Nancy Solano by LYNN DIAGNOSTICS, on December 18, 1999.  According to the form, the referring physician was TAMAREN and the physician providing the testing was MONTONI.

198.    On or about January 6, 2000, a "Medical Biller" employed by Symco, drafted and mailed to Liberty Mutual Insurance a letter requesting payment of $2254.00, to LYNN DIAGNOSTICS, for services to Nancy Solano on December 18, 1999.  The letter identified an outstanding balance $2254.00.

199. Sometime in 2000, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated prescription for an EMG and NCV for Carmen Marmolejos.

200. Sometime in 2000, the exact date being unknown, the Defendant DAVID TAMAREN prepared and signed an undated request for an EMG and NCV of the left upper extremities of Carmen Marmolejos.

201. On or about January 8, 2000, the Defendant JOHN MONTONI affixed his signature to a document, said document purportedly being a report of EMG and NCV testing purported to have been performed on Carmen Marmolejos.  The EMG tests were not done on Carmen Marmolejos as represented by the documents.

202. On or about February 16, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed a Health Insurance Claim Form, seeking payment in the amount of $1352.00 to LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on January 8, 2000 on Carmen Marmolejos.  According to the Claim Form, dated February 16, 2000, the referring physician was the Defendant DAVID TAMAREN, and the physician providing the

testing was the Defendant MONTONI.

203. On or about March 16, 2000, one or more of the Defendants or someone acting on their behalf, prepared and mailed to CGU Insurance a Health Insurance Claim Form, seeking payment in the amount of $1352.00 to LYNN DIAGNOSTICS for NCV and EMG testing purportedly conducted on January 8, 2000 on Carmen Marmolejos. According to the Claim Form, March 16, 2000, the referring physician was the Defendant DAVID TAMAREN, and the physician providing the testing was the Defendant MONTONI.

204. On or about May 17, 2001, CGU prepared and mailed a check in the amount of $1273.47 to LYNN DIAGNOSTICS MANAGEMENT for services to Carmen Marmolejos. The check was endorsed by a principal of LYNN and deposited into a LYNN account and deposited into the account of LYNN DIAGNOSTICS on May 21, 2001.

All in violation of Title 18, United States Code, Section 371.

100

### COUNT FORTY-THREE
### TITLE 18, UNITED STATES CODE, SECTION 1956(h)
### (MONEY LAUNDERING CONSPIRACY)

From in or about January 1999, through in or after 2002, in
the District of Massachusetts and elsewhere, the defendants,

IGOR MOYSEYEV,
SEVERIN YELAUN,

did knowingly and unlawfully conspire with each other and with
others known and unknown to the Grand Jury, knowingly to conduct
and attempt to conduct financial transactions affecting
interstate and foreign commerce, that is, to engage in financial
transactions involving United States currency and bank checks,
which in fact involved the proceeds of specified unlawful
activity, that is, Mail Fraud in violation of Title 18, United
States Code, Sections 1341, Wire Fraud in violation of Title 18,
United States Code, Section 1343, and Health Care Fraud in
violation of Title 18, United States Code, Section 1347, with
intent to promote the carrying on of said specified unlawful
activity, and knowing that the transactions were designed in
whole and in part to conceal and disguise the nature, location,
source, ownership, and control of the proceeds of that specified
unlawful activity, and knowing, while conducting and attempting
to conduct such financial transactions, that the property
involved in the financial transactions represented the proceeds
of some form of unlawful activity, in violation of 18 U.S.C.
§1956(a)(1)(A)(i) and (B)(i).

All in violation of Title 18, United States Code, Section
1956(h).

101

## COUNTS FORTY-FOUR THROUGH FIFTY-EIGHT
## TITLE 18, UNITED STATES CODE, SECTION 1956(a)(1)(A)(i)
## MONEY LAUNDERING

On or the dates set forth below, as to the enumerated counts, in the District of Massachusetts and elsewhere, the defendants,

IGOR MOYSEYEV and
SEVERIN YELAUN,

did knowingly conduct and attempt to conduct financial transactions set forth below, that is, the issuance of checks drawn on the GLOBAL TECH DIAGNOSTICS account at Bank Boston and Fleet Bank, as payments to the individuals and entities identified below, which transactions affected interstate and foreign commerce, and which transactions involved the proceeds of specified unlawful activity, that is, Mail Fraud in violation of Title 18, United States Code, Sections 1341, Wire Fraud in violation of Title 18, United States Code, Section 1343, and Health Care Fraud in violation of  Title 18, United States Code, Section 1347, with intent to promote the carrying on of specified unlawful activity, that is the wire fraud, mail fraud and health care fraud alleged in Counts One through Thirty-One of this Indictment, and while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

102

| COUNT | DATE | PAYEE | CHECK DATE, # & AMOUNT |
|-------|------|-------|------------------------|
| Forty-Four | 3-7-00 | Symco Medical Billing, Inc. | 2-25-00, #1219, $875.17 |
| Forty-Five | 3-21-00 | Symco Medical Billing, Inc. | 3-15-00, #1226, $637.35 |
| Forty-Six | 4-17-00 | Symko | 4-12-00, #1235, $968.96 |
| Forty-Seven | 5-16-00 | Symco Medical Billing Inc. | 5-15-00, #1244, $680.55 |
| Forty-Eight | 6-20-00 | Cymco Medical Billing | 6-15-00, #1246, $506.67 |
| Forty-Nine | 7-19-00 | Symco Medical Billing | 7-15-00, #1253, $1070.27 |
| Fifty | 9-25-00 | Symco Medical Billing Inc. | 8-1-00, #1264, $349.88 |
| Fifty-One | 8-29-00 | Symco Medical | 8-15-00, #1260, $541.85 |
| Fifty-Two | 11-22-00 | Symco Medical Billing | 11-15-00, #1270, $70.37 |
| Fifty-Three | 12-20-00 | Symco Medical Billing Inc. | 12-15-00, #107, $367.12 |
| Fifty-Four | 1-17-01 | Symco Medical Billing Inc. | 1-15-01, #108, $236.23 |
| Fifty-Five | 2-19-01 | Symco Medical Billing | 2-15-01, #115, $109.31 |
| Fifty-Six | 5-21-01 | Symco Medical | 5-15-01, #120, $674.27 |
| Fifty-Seven | 3-29-00 | Marina R. Istchenko, CPA | 3-27-00, #1228 $350 |
| Fifty-Eight | 3-20-01 | Marina R. Istcenko | 3-20-01, #119, $325 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and Section 2.

103

**A TRUE BILL**

*Deputy* _____
FOREPERSON OF THE GRAND JURY

_____
ASSISTANT U.S. ATTORNEY

1/13/05
_____
DATE

DISTRICT OF MASSACHUSETTS
DATE AND TIME:

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

3:28P

104

JS 45 (5/97) - (Revised USAO MA 6/29/04)

# Criminal Case Cover Sheet    05 CR 1 0 0 1 0 NMG   U.S. District Court - District of Massachusetts

**Place of Offense:** _____    **Category No.** I_____    **Investigating Agency** FBI & IRS_____

**City**  Boston_____    **Related Case Information:**

**County**   Suffolk_____   Superseding Ind./ Inf.  _____    Case No.   _____
Same Defendant  _____    New Defendant _____
Magistrate Judge Case Number   _____
Search Warrant Case Number    _____
R 20/R 40 from District of   _____

## Defendant Information:

Defendant Name  Igor Moyseyev_____    Juvenile   ☐ Yes    ☒ No

Alias Name  _____

Address   20 Keefe Avenue, Newton, MA 02464_____

Birth date (Year only):  1959  SSN (last 4 #):  5559  Sex  M  Race:   Caucasian___  Nationality:  USA_____

**Defense Counsel if known:**   _____    **Address:** _____

**Bar Number:**   _____

## U.S. Attorney Information:

**AUSA**  James J. McGovern & Jeffrey Auerhahn_____    **Bar Number if applicable**  _____

**Interpreter:**    ☒ Yes ☐ No    **List language and/or dialect:**    **Russian**_____

**Matter to be SEALED:**    ☒ Yes    ☐ No

☒ **Warrant Requested**    ☐ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:**   _____

☐ **Already in Federal Custody as**  _____ in  _____  .
☐ **Already in State Custody** _____  ☐ **Serving Sentence**  ☐ **Awaiting Trial**
☐ **On Pretrial Release:   Ordered by** _____  on  _____

**Charging Document:**    ☐ Complaint    ☐ Information    ☒ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☒ Felony   58

### Continue on Page 2 for Entry of U.S.C. Citations

☑   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:**  i/13/c5_____    **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number (To be filled in by deputy clerk): 05  1 0 NMG

Name of Defendant    Igor Moyseyev

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C 1341 | Mail Fraud | 1 through 37 |
| Set 2 | 18 U.S.C. 1343 | Wire Fraud | 38 through 40 |
| Set 3 | 18 U.S.C. 1347 | Health Care Fraud | 41 |
| Set 4 | 18 U.S.C. 371 | Conspiracy | 42 |
| Set 5 | 18 U.S.C. 1956(h) | Money Laundering Conspiracy | 43 |
| Set 6 | 18USC 1956(a)(1)(A)(i) | Money Laundering | 44-58 |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

ADDITIONAL INFORMATION:

‰JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet** 05 CR 1 0 0 1 0 NMG **U.S. District Court - District of Massachusetts**

**Place of Offense:** _____   **Category No.** 1 _____   **Investigating Agency** FBI & IRS _____

**City** Boston _____   **Related Case Information:**

**County** Suffolk _____

| | |
|---|---|
| Superseding Ind./ Inf. _____ | Case No. _____ |
| Same Defendant _____ | New Defendant _____ |
| Magistrate Judge Case Number | _____ |
| Search Warrant Case Number | _____ |
| R 20/R 40 from District of | _____ |

**Defendant Information:**

Defendant Name  Severin V. Yelaun _____   Juvenile  ☐ Yes  ☒ No

Alias Name _____

Address  70 Shrewsbury Green, #L, Shrewsbury, MA 01545 _____

Birth date (Year only): 1974  SSN (last 4 #): 0445  Sex M  Race: Caucasian  Nationality: USA _____

**Defense Counsel if known:** _____   **Address:** _____

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  James J. McGovern & Jeffrey Auerhahn _____   **Bar Number if applicable** _____

**Interpreter:**  ☒ Yes ☐ No   **List language and/or dialect:**  Russian _____

**Matter to be SEALED:**  ☒ Yes  ☐ No

  ☒ **Warrant Requested**   ☐ **Regular Process**   ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ **in** _____ .
☐ **Already in State Custody** _____  ☐ **Serving Sentence**  ☐ **Awaiting Trial**
☐ **On Pretrial Release:**  **Ordered by** _____ **on**

**Charging Document:**  ☐ Complaint  ☐ Information  ☒ Indictment

**Total # of Counts:**  ☐ Petty _____  ☐ Misdemeanor _____  ☒ Felony  58

**Continue on Page 2 for Entry of U.S.C. Citations**

☑  I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

**Date:** 1/15/05   **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    Severin V. Yelaun

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 U.S.C 1341 | Mail Fraud | 1 through 37 |
| Set 2  18 U.S.C. 1343 | Wire Fraud | 38 through 40 |
| Set 3  18 U.S.C. 1347 | Health Care Fraud | 41 |
| Set 4  18 U.S.C. 371 | Conspiracy | 42 |
| Set 5  18 U.S.C. 1956(h) | Money Laundering Conspiracy | 43 |
| Set 6  18USC 1956(a)(1)(A)(i) | Money Laundering | 44-58 |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

🖎JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**  05 CR 10010 NMG  **U.S. District Court - District of Massachusetts**

**Place of Offense:** _____    **Category No.** 1 _____    **Investigating Agency** FBI & IRS _____

**City**  Boston _____    **Related Case Information:**

**County**    Suffolk _____

Superseding Ind./ Inf. _____    Case No. _____
Same Defendant _____    New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   David S. Tamaren _____    Juvenile ☐ Yes  ☒ No

Alias Name _____

Address    34D Constitution Way, Marblehead, MA 01945 _____

Birth date (Year only):  1944    SSN (last 4 #):  4805   Sex  M  Race:    Caucasian     Nationality:  USA

**Defense Counsel if known:**    Jonathan D. Plaut _____    **Address:**  101 Trement Street, Suite 614
Boston, MA 02108

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**   James J. McGovern & Jeffrey Auerhahn _____    **Bar Number if applicable** _____

**Interpreter:** ☐ Yes ☒ No    **List language and/or dialect:** _____

**Matter to be SEALED:** ☒ Yes  ☐ No

☒ **Warrant Requested**    ☐ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____  in _____  .
☐ **Already in State Custody** _____  ☐ **Serving Sentence**  ☐ **Awaiting Trial**
☐ **On Pretrial Release:  Ordered by** _____  on _____

**Charging Document:**   ☐ Complaint    ☐ Information    ☒ Indictment

**Total # of Counts:**   ☐ Petty _____  ☐ Misdemeanor _____  ☒ Felony  58

**Continue on Page 2 for Entry of U.S.C. Citations**

☑    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

**Date:**   1/13/05    **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number (To be filled in by deputy clerk):** 05 CR NMG

**Name of Defendant**    David S. Tamaren

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 U.S.C 1341 | Mail Fraud | 1 through 37 |
| Set 2  18 U.S.C. 1343 | Wire Fraud | 38 through 40 |
| Set 3  18 U.S.C. 1347 | Health Care Fraud | 41 |
| Set 4  18 U.S.C. 371 | Conspiracy | 42 |
| Set 5  18 U.S.C. 1956(h) | Money Laundering Conspiracy | 43 |
| Set 6  18USC 1956(a)(1)(A)(i) | Money Laundering | 44-58 |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet** 05 CR 10010 NMG U.S. District Court - District of Massachusetts

**Place of Offense:** _____ **Category No.** I _____ **Investigating Agency** FBI & IRS _____

**City** Boston _____

**County** Suffolk _____

**Related Case Information:**

Superseding Ind./ Inf. _____ Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   John F. Montoni _____    Juvenile  [ ] Yes   [X] No

Alias Name _____

Address   193 Washington Street, Gloucester, MA 01930 _____

Birth date (Year only):  1953  SSN (last 4 #):  8742  Sex  M  Race:   Caucasian    Nationality:  USA _____

**Defense Counsel if known:**   Neil F. Faigel _____    Address:  265 Broadway _____
                                                                     Methuen, MA 01844 _____

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  James J. McGovern & Jeffrey Auerhahn _____    Bar Number if applicable _____

**Interpreter:**    [ ] Yes  [X] No        List language and/or dialect: _____

**Matter to be SEALED:**    [X] Yes    [ ] No

     [X] Warrant Requested        [ ] Regular Process        [ ] In Custody

**Location Status:**

**Arrest Date:** _____

[ ] Already in Federal Custody as _____ in _____ .
[ ] Already in State Custody _____  [ ] Serving Sentence  [ ] Awaiting Trial
[ ] On Pretrial Release:   Ordered by _____ on

**Charging Document:**    [ ] Complaint    [ ] Information    [X] Indictment

**Total # of Counts:**    [ ] Petty _____    [ ] Misdemeanor _____    [X] Felony   58

Continue on Page 2 for Entry of U.S.C. Citations

[✓]  I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:** 1/13/05            **Signature of AUSA:** _____

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    John F. Montoni _____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C 1341 | Mail Fraud | 1 through 37 |
| Set 2 | 18 U.S.C. 1343 | Wire Fraud | 38 through 40 |
| Set 3 | 18 U.S.C. 1347 | Health Care Fraud | 41 |
| Set 4 | 18 U.S.C. 371 | Conspiracy | 42 |
| Set 5 | 18 U.S.C. 1956(h) | Money Laundering Conspiracy | 43 |
| Set 6 | 18USC 1956(a)(1)(A)(i) | Money Laundering | 44-58 |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**